25955 JPB/BMM

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| KEVIN KEILMAN and CYNTHIA KEILMAN, Plaintiffs, | ) | |
| v. | ) | No: 2017-cv-03683 |
| SAM'S WEST INC., by and through its authorized agents, servants, and/or employees, Defendant. | ) | Judge Charles P. Kocoras<br>Magistrate Judge Young B. Kim |

| | |
|---|---|
| SAM'S WEST, INC., Third-Party Plaintiff, | ) |
| v. | ) |
| HAYES BEER DISTRIBUTING COMPANY, Third-Party Defendant. | ) |

**SAM'S WEST, INC.'S THIRD PARTY COMPLAINT AGAINST HAYES BEER DISTRIBUTING COMPANY**

NOW COMES the Defendant, SAM'S WEST, INC. (hereinafter "SAM'S WEST"), by and through its attorneys, O'HAGAN MEYER LLC, and complaining of the Third-Party Defendant, HAYES BEER DISTRIBUTING COMPANY (hereinafter "HAYES"), states as follows:

**COUNT I: CONTRIBUTION**

1. On or about March 21, 2017, Plaintiffs filed their Complaint against Defendant/Third-Party Plaintiff, SAM'S WEST, seeking damages for a personal injury KEVIN

KEILMAN suffered on April 13, 2016, at the Sam's Club located at 21430 South Cicero, Matteson, Illinois. (*See* Plaintiffs Complaint at Law, attached hereto as Exhibit A).

2. Plaintiffs have alleged in their Complaint that Defendant/Third-Party Plaintiff, SAM'S WEST was negligent. (*See* Exhibit A).

3. Defendant/Third-Party Plaintiff SAM'S WEST denies all material allegations of fault set forth against it. (*See* Defendant's Answer to Plaintiffs' Complaint at Law, attached hereto as Exhibit B).

4. On April 13, 2016, Third-Party Defendant, HAYES was providing beer distribution services to the Sam's Club located at 21430 South Cicero, Matteson, Illinois, pursuant to a contract between Defendant/Third-Party Plaintiff SAM'S WEST and Third-Party Defendant, HAYES. (*See* "Vendor Agreement," hereinafter "Agreement," attached hereto as Exhibit C).

5. KEVIN KEILMAN alleges that he tripped on clear piece of plastic in the dock area of the Sam's Club located at 21430 South Cicero, Matteson, Illinois. (*See* Exhibit A).

6. HAYES had a duty to use reasonable care in providing beer distribution services to the Sam's Club located at 21430 South Cicero, Matteson, Illinois.

7. Without prejudice to any and all the denials made by Defendant/Third-Party Plaintiff SAM'S WEST of all material allegations contained within Plaintiffs' Complaint at Law, and without waiving any defenses to the Complaint, SAM'S WEST alleges that Third-Party Defendant HAYES was then and there guilty of one or more of the following careless and negligent acts and/or omissions:

a. Failed to cause KEVIN KEILMAN or any of its employees to properly wrap the pallet of beer;

b. Failed to properly train KEVIN KEILMAN or any of its agents/employees how to properly wrap the pallet of beer; and

c. Failed to provide KEVIN KEILMAN or any of its agents/employees with the necessary equipment to perform their duties.

8. As a direct and proximate result of Third-Party Defendant HAYES actions, Plaintiff KEVIN KEILMAN allegedly sustained injuries.

9. If Plaintiffs are entitled to any recovery, it will be based on one or more of the foregoing acts of Third-Party Defendant, HAYES, having directly and proximately caused the injuries/damages claimed in Plaintiffs' Complaint at Law.

10. Pursuant to the Illinois Contribution Act, 740 ILCS 100/1 *et. seq.*, Defendant/Third-Party Plaintiff SAM'S WEST is entitled to contribution, in such an amount as would be commensurate with the degree of fault or misconduct attributable to the Third-Party Defendant HAYES for proximately causing the Plaintiffs injuries/damages, if any.

WHEREFORE, the Defendant/Third-Party Plaintiff, SAM'S WEST, INC. prays that if judgment is entered on Plaintiffs' Complaint at Law in favor of Plaintiffs and against Defendant/Third-Party Plaintiff, SAM'S WEST, INC. that judgment be entered against the Third-Party Defendant, HAYES BEER DISTRIBUTING COMPANY by way of contribution in such an amount commensurate with the degree of culpability attributable to HAYES BEER DISTRIBUTING COMPANY for proximately causing Plaintiffs alleged injuries and damages.

**<u>COUNT II: BREACH OF CONTRACT</u>**

1-10. Paragraphs 1 – 10 of Count I are repeated and re-alleged as and for Paragraphs 1-10 of Count II, as if fully stated.

11. Before and at the time of the underlying accident, the Agreement between Defendant/Third-Party Plaintiff SAM'S WEST and Third-Party Defendant HAYES provided in pertinent part:

12. Specifically, page 1 and page 2, Paragraph 6 of the Agreement entitled Indemnification provides that:

> Vendor shall protect, defend, hold harmless and indemnify Purchaser from and against any and all claims, actions, liabilities, losses, costs and expenses, including reasonable attorney fees and costs, even if such claims are groundless, fraudulent or false, arising out of any actual or alleged infringement of any patent, trademark tradedress or copyright by any merchandise sold to the Purchaser hereunder, or arising out of any actual or alleged death of or injury to any person, damage to any property, or any other damage or loss, by whomsoever suffered, resulting or claimed to result in whole or in part from any actual or alleged defect in such merchandise, whether latent or patent, including actual or alleged improper construction or design of said merchandise or the failure of said merchandise to comply with specifications or with any express or implied warranties of Vendor, or arising out of any actual or alleged violation by such merchandise, or its manufacturer, possession or use or sales, of any law, statute or ordinance of any governmental administrative order, rule or regulation arising out or Vendor's installation of merchandise covered by this agreement. The duties and obligations of Vendor created hereby shall not be affected or limited in any way by Purchaser's extension of express or implied warranties to its customers except to the extent that any such warranties expressly extend beyond the scope of Vendor's warranties, express or implied, to purchaser. It is further agreed that all duties and obligations of Vendor set for in this paragraph shall extend in full force and effect to the pallets or other transport or display provided by or at the direction of Vendor.

(*See* Exhibit C).

13. Pursuant to Paragraph 6 Indemnification provision of the aforementioned Agreement, the Defendant/Third-Party Plaintiff SAM'S WEST has tendered its defense to the Third-Party Defendant HAYES. (A copy of correspondence between counsel for SAM'S WEST and HAYES is attached hereto as Exhibit D).

14. Third-Party Defendant HAYES has not accepted the tender of defense despite the terms of this Agreement.

15. The failure of Third-Party Defendant HAYES to accept the tender of defense and indemnify Defendant/Third-Party Plaintiff SAM'S WEST constitutes a breach of the aforementioned Agreement.

16. Due to Third-Party Defendant HAYE's breach of its contractual obligation to defend and indemnify Defendant/Third-Party Plaintiff SAM'S WEST, SAM'S WEST has incurred attorney's fees and costs in its defense of Plaintiffs' lawsuit which Defendant/Third-Party Plaintiff SAM'S WEST would not have incurred had Third-Party Defendant HAYES fulfilled its contractual obligations.

WHEREFORE, the Defendant/Third-Party Plaintiff, SAM'S WEST demands judgment against the Third-Party Defendant, HAYES for all sums allowable by law, including, but not limited to any cost, expenses, judgments, settlements, attorneys' fees, or any other figure, including post-judgment interest or debts that Defendant/Third-Party Plaintiff, SAM'S WEST, INC. has incurred or will incur defending this action brought by Plaintiffs or in prosecuting this Third-Party Complaint against the Third-Party Defendant.

**COUNT III: INDEMNIFICATION**

1-16. Paragraphs 1 – 16 of Counts II are repeated and re-alleged as and for Paragraphs 1-16 of Count III, as if fully stated.

17. Pursuant to Paragraph 6 Indemnification provision of the aforementioned Agreement, Defendant/Third-Party Plaintiff, SAM'S WEST has tendered its defense to Third-Party Defendant, HAYES. (*See* Exhibit C).

18. Third-Party Defendant HAYES has not accepted the tender of defense despite the terms of this Agreement.

19. Based on the allegations in Plaintiffs' Complaint, Third-Party Defendant HAYES has a duty to defend and indemnify Defendant/Third-Party Plaintiff SAM'S WEST for any and all amounts where SAM'S WEST will be liable to Plaintiffs, along with any and all expenses including attorneys' fees in defending this lawsuit and in prosecuting this Third-Party Complaint.

20. The failure of Third-Party Defendant HAYES to accept Defendant/Third-Party Plaintiff SAM'S WEST's tender of defense and to agree to indemnify it is a breach of the Indemnity provision of the aforementioned Agreement and the duty owed to Defendant/Third-Party Plaintiff SAM'S WEST.

WHEREFORE, Defendant/Third-Party Plaintiff, SAM'S WEST, INC. demands judgment against Third-Party Defendant, HAYES BEER DISTRIBUTING COMPANY in the amount of any costs, expenses, judgments, settlement or any other damages that the Defendant/Third-Party Plaintiff, SAM'S WEST, INC. has been required to pay or will expend in the future as a result of the action filed by Plaintiffs.

Respectfully Submitted,

/s/Brian M. Martinez

One of the Attorneys for Sam's West, Inc.

James P. Balog, Esq.
Brian M. Martinez, Esq.
O'Hagan Meyer LLC
One East Wacker Drive, Suite 3400
Chicago, Illinois 60601
(312) 422-6100
jbalog@ohaganmeyer.com
bmartinez@ohaganmeyer.com

ELECTRONICALLY FILED
3/21/2017 1:47 PM
2017-L-002923
CALENDAR: F
PAGE 1 of 6
CIRCUIT COURT OF
COOK COUNTY, ILLINOIS
LAW DIVISION
CLERK DOROTHY BROWN

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

| | | |
|---|---|---|
| KEVIN KEILMAN & CYNTHIA KEILMAN, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. |
| | ) | |
| vs. | ) | |
| | ) | |
| SAM'S WEST, INC., by and through its authorized agents, servants, and/or employees | ) | |
| | ) | |
| Defendants. | ) | |

**COMPLAINT AT LAW**

NOW COMES the Plaintiffs, KEVIN and CYNTHIA KEILMAN, (hereinafter referred to as KEILMAN) by and through their attorneys, LEONARD LAW GROUP, LLC., and for their Complaint against the Defendants, SAM'S WEST, INC. (hereinafter referred to as SAMS), an Illinois Corporation, and its duly authorized agents, servants, and employees, and states as follows:

**Count I - Negligence**
**KEVIN KEILMAN v SAM'S WEST, INC.**

1. On or about April 13, 2016, and at all times material, Defendant SAMS, was a corporation duly registered in the State of Arkansas, with stores located throughout the Chicagoland area.

2. On or about April 13, 2016 and at all times material, SAMS was doing substantial business in Cook Count in the State of Illinois.

EXHIBIT
A

3. On or about April 13, 2016, SAMS operated, managed, conducted, and or controlled a business called SAM'S CLUB located at 21430 South Cicero, in the City of Matteson, in the County of Cook, in the State of Illinois.

4. Prior to April 13, 2016, SAMS, contracted with Plaintiff's employer Hayes Beer Distributing Company, to receive beer deliveries to SAMS located at 21430 South Cicero, in the City of Matteson, in the State of Illinois.

5. On April 13, 2016, KEVIN KEILMAN was lawfully on the premises at SAMS as an employee of Hayes Beer Distributing Company, and invitee of SAMS, in order to deliver pallets of beer to SAMS.

6. On said date and before, and at all times material, Defendant SAMS employed various individuals to work the dock area.

ELECTRONICALLY FILED
3/21/2017 1:47 PM
2017-L-002923
PAGE 2 of 6

7. On April 13, 2016, PLAINTIFF was met by an employee named Judy who was sitting behind a glass partition and handed Judy the delivery ticket.

8. On said date, Plaintiff then proceeded with permission from Judy, to enter the dock area and proceeded to walk to the dock door and lifted the SAMS dock door upward allowing access to the rear of his trailer.

9. At said place and time Plaintiff then removed two parcels in order for the designated SAMS dock worker named Andy to remove approximately 5 pallets of beer that were designated for SAMS.

10. During the unloading process, Plaintiff proceeded back to the area where Judy was working and sat down on a broken-down pallet to wait for the beer to be off loaded by SAMS employee Andy.

11. At no time was Plaintiff told he could not sit in said area while waiting.

12. That Plaintiff had sat at or near this area in the past without discipline from SAMS or any of its employees or dock workers and there were no signage or other barrier that prevented or prohibited Plaintiff from sitting there.

13. That on said date this dock area had pallets placed throughout the area where plaintiff was sitting that had been left unattended, were opened, and or/partially broken down.

14. That on said date and after Andy finished removing approximately 5 skids of beer from Plaintiff's trailer, Plaintiff arose from his seated position and began to walk back to his trailer to complete the delivery.

ELECTRONICALLY FILED
3/21/2017 1:47 PM
2017-L-002923
PAGE 3 of 6

15. That at that time and place Plaintiff walked between 2 pallets placed there by SAMS employees and in doing so tripped on a clear piece of plastic that had been left to lie on the dock area, tightly stretched from one pallet to the adjacent pallet, that was unseen by Plaintiff causing him to suddenly fall and sustain a serious fracture requiring surgery.

16. This plastic wrap was lying flat to the dock floor and was not open and obvious to Plaintiff, or other invitees such as Plaintiff.

17. That there were no warning signs on, at or near to the pallets where Plaintiff had been sitting to warn Plaintiff that this plastic wrap was on the ground where he was allowed and permitted to walk.

18. That Plaintiff's attention was distracted from appreciating any tripping hazard left behind by SAMS agents and/or employees, including this plastic wrap, as Plaintiff was looking at his trailer while walking as Andy had just finished unloading the beer.

19. That Plaintiff had to encounter this plastic wrap as it was in the pathway to his trailer and crossed the dock floor from one pallet to the adjacent other.

20. That on or about April 13, 2016, Defendant SAMS by and through its agents, servants, employees, and apparent agents, including but not limited to its dock employees Judy and Andy, and others not yet identified, owed a duty of care to KEVIN KEILMAN so as to act with reasonable care to provide for his safety and provide him a safe place for him to perform his job.

21. On April 13, 2016 and at all times material, SAMS individually, and thru its authorized agents, servants, and employees, breached its aforementioned duty to KEVIN KEILMAN in one or more of the following respects:

ELECTRONICALLY FILED
3/21/2017 1:47 PM
2017-L-002923
PAGE 4 of 6

a. failed to provide Plaintiff with a safe and secure mandatory walking area while Plaintiff was in the dock area;
b. failed to provide Plaintiff with a safe and secure mandatory sitting area while Plaintiff was in the dock area;
c. failed to remove pallet deliveries from the dock floor that had arrived prior to Plaintiff's arrival;
d. had an unsafe practice of removing merchandise from some pallets in the dock area without regard to the plastic wrap debris left behind by its employees and dock workers;
e. failed to appreciate the tripping hazard of the plastic wrap debris used on the pallets and left behind by SAMS employees;
f. failed to section off the area where Plaintiff fell as a no walk zone;
g. failed to warn Plaintiff that its employees left behind some plastic wrap material that Plaintiff or others may not see and posed a danger;
h. maneuvered the already off loaded pallets that had been delivered prior to plaintiff's arrival into such a position so as to rip the plastic wrapping material, and in doing so, created a dangerous and hidden tripping hazard;

i. failed to monitor the dock area for any unsafe conditions as required by its own risk department protocols, procedures and guidelines;

j. failed to remedy this specific unsafe condition to the dock area that was created by its agents and employees while under their exclusive control;

k. was otherwise careless and/or negligent.

22. As a direct and proximate result of the aforementioned negligent acts and/or omissions, KEVIN KEILMAN suffered bodily harm, both internally and externally; underwent surgery, suffered and will in the future suffer disfigurement, pain and suffering, disability, and loss of a normal life; has an increased risk of future harm; suffered and will in the future suffer emotional distress; has lost and will in the future lose economic benefits including monies paid for medical care, lost wages, future medical care, and future lost wages.

ELECTRONICALLY FILED
3/21/2017 1:47 PM
2017-L-002923
PAGE 5 of 6

WHEREFORE, the Plaintiff, KEVIN KEILMAN, demands judgment against the defendant, SAM'S WEST, INC.., an Illinois corporation, in an amount of money in excess of $50,000.00 plus costs.

**Count II – Loss of Consortium**
**CYNTHIA KEILMAN v SAM'S WEST, INC.**

1-22. Plaintiffs reincorporate paragraphs 1-24 and all subparts (a) thru (k) of Count I as paragraphs 1-22 of Count Two.

23. On April 13, 2016, Plaintiff CYNTHIA KEILMAN was and remains the lawful wife of Plaintiff KEVIN KEILMAN.

24. As a result of the aforementioned negligent acts by Defendant SAMS, Plaintiff CYNTHIA KEILMAN has lost society, companionship, and sexual relationship with her husband, Plaintiff KEVIN KEILMAN.

WHEREFORE, the Plaintiff, CYNTHIA KEILMAN, demands judgment against the defendant SAM'S WEST, INC.., an Illinois corporation, in an amount of money in excess of $50,000.00 plus costs.

**THE PLAINTIFF DEMANDS TRIAL BY JURY**

Respectfully,

LEONARD LAW GROUP LLC.

Joseph J. Leonard

ELECTRONICALLY FILED
3/21/2017 1:47 PM
2017-L-002923
PAGE 6 of 6

LEONARD LAW GROUP LLC.
300 South Ashland Ave., Suite 101
Chicago, IL 60607
Tel (312) 226 8273
Fax (312) 226 8274
Atty No. 49286
Joseph@Leonardlawgroup.net

ELECTRONICALLY FILED
3/21/2017 1:47 PM
2017-L-002923
CALENDAR: F
PAGE 1 of 1
CIRCUIT COURT OF
COOK COUNTY, ILLINOIS
LAW DIVISION
CLERK DOROTHY BROWN

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

| | | |
|---|---|---|
| KEVIN KEILMAN & CYNTHIA KEILMAN, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. |
| | ) | |
| vs. | ) | |
| | ) | |
| SAM'S WEST, INC., by and through its authorized agents, servants, and/or employees | ) | |
| | ) | |
| Defendants. | ) | |

**AFFIDAVIT REGARDING DAMAGES SOUGHT**

Plaintiffs, KEVIN KEILMAN & CYNTHIA KEILMAN by their attorneys Leonard Law Group, LLC., being first duty sworn under oath, state as follows;

1. That the affiant is the attorney of record for the Plaintiffs in this matter.

2. That the total money damages sought in this civil action exceeds the amount of $50,000.00.

FURTHER AFFIANT SAYETH NOT.

By: ______________________
Joseph J. Leonard

SUBSCRIBED AND SWORN to before me
this 21st day of March, 2017

______________________
Notary Public

MARIA ROSALY VILLEGAS
Official Seal
Notary Public - State of Illinois
My Commission Expires Sep 30 2020

25955-JPB

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| KEVIN KEILMAN and CYNTHIA KEILMAN, Plaintiffs, | ) | |
| *v.* | ) | No. 2017-cv-03683 |
| SAM'S WEST, INC., by and through its Authorized agents, servants, and/or employees, Defendants. | ) | Judge Charles P. Kocoras<br>Magistrate Judge Young B. Kim |

**DEFENDANT SAM'S WEST, INC.'S ANSWER AND**
**<u>AFFIRMATIVE DEFENSES TO PLAINTIFFS'COMPLAINT AT LAW</u>**

NOW COMES the Defendant, **Sam's West, Inc.**, by and through its attorneys, James P. Balog and Brian M. Martinez of O'Hagan Meyer LLC, and pursuant to Fed. R. Civ. P. 8(b) and (c), submits its Answer and Affirmative Defenses to Plaintiffs' Complaint at Law:

Count I — Negligence
<u>Kevin Keilman v. Sam's West, Inc.</u>

1. On or about April 13, 2016, and at all times material, Defendant SAMS, was a corporation duly registered in the State of Arkansas, with stores located throughout the Chicagoland area.

**<u>ANSWER</u>: The Defendant admits the allegations of paragraph 1 of Count I of Plaintiffs' Complaint at Law.**

2. On or about April 13, 2016 and at all times material, SAMS was doing substantial business in Cook Count [*sic*] in the State of Illinois.

**<u>ANSWER</u>: The Defendant admits the allegations of paragraph 2 of Count I of Plaintiffs' Complaint at Law.**

3. On or about April 13, 2016, SAMS operated, managed, conducted, and or controlled a business called SAM'S CLUB located at 21430 South Cicero, in the City of Matteson, in the County of Cook, in the State of Illinois.

EXHIBIT
B

**ANSWER: The Defendant admits operating a retail store at the time and place alleged but denies the remaining allegations and legal conclusions of paragraph 3 of Count I of Plaintiffs' Complaint at Law.**

4. Prior to April 13, 2016, SAMS, contracted with Plaintiff's employer Hayes Beer Distributing Company, to receive beer deliveries to SAMS located at 21430 South Cicero, in the City of Matteson, in the State of Illinois.

**ANSWER: The Defendant admits the allegations of paragraph 4 of Count I of Plaintiffs' Complaint at Law.**

5. On April 13, 2016, KEVIN KEILMAN was lawfully on the premises at SAMS as an employee of Hayes Beer Distributing Company, and invitee of SAMS, in order to deliver pallets of beer to SAMS.

**ANSWER: The Defendant admits the allegations of paragraph 5 of Count I of Plaintiffs' Complaint at Law.**

6. On said date and before, and at all times material, Defendant SAMS employed various individuals to work the dock area.

**ANSWER: The Defendant admits the allegations of paragraph 6 of Count I of Plaintiffs' Complaint at Law.**

7. On April 13, 2016, PLAINTIFF was met by an employee named Judy who was sitting behind a glass partition and handed Judy the delivery ticket.

**ANSWER: The Defendant has insufficient information to admit or deny the allegations of paragraph 7 of Count I of Plaintiffs' Complaint at Law and, therefore, neither admits nor denies the allegations.**

8. On said date, Plaintiff then proceeded with permission from Judy, to enter the dock area and proceeded to walk to the dock door and lifted the SAMS dock door upward allowing access to the rear of his trailer.

**ANSWER: The Defendant has insufficient information to admit or deny the allegations of paragraph 8 of Count I of Plaintiffs' Complaint at Law and, therefore, neither admits nor denies the allegations.**

9. At said place and time Plaintiff then removed two parcels in order for the designated SAMS dock worker named Andy to remove approximately 5 pallets of beer that were designated for SAMS.

**ANSWER: The Defendant has insufficient information to admit or deny the allegations of paragraph 9 of Count I of Plaintiffs' Complaint at Law and, therefore, neither admits nor denies the allegations.**

10. During the unloading process, Plaintiff proceeded back to the area where Judy was working and sat down on a broken-down pallet to wait for the beer to be off loaded by SAMS employee Andy.

**ANSWER: The Defendant denies the allegations and legal conclusions of paragraph 10 of Count I of Plaintiffs' Complaint at Law.**

11. At no time was Plaintiff told he could not sit in said area while waiting.

**ANSWER: The Defendant denies the allegations and legal conclusions of paragraph 11 of Count I of Plaintiffs' Complaint at Law.**

12. That Plaintiff had sat at or near this area in the past without discipline from SAMS or any of its employees or dock workers and there were no signage or other barrier that prevented or prohibited Plaintiff from sitting there.

**ANSWER: The Defendant denies the allegations and legal conclusions of paragraph 12 of Count I of Plaintiffs' Complaint at Law.**

13. That on said date this dock area had pallets placed throughout the area where plaintiff was sitting that had been left unattended, were opened, and or/partially broken down.

**ANSWER: The Defendant denies the allegations and legal conclusions of paragraph 13 of Count I of Plaintiffs' Complaint at Law.**

14. That on said date and after Andy finished removing approximately 5 skids of beer from Plaintiff's trailer, Plaintiff arose from his seated position and began to walk back to his trailer to complete the delivery.

**ANSWER: The Defendant denies the allegations and legal conclusions of paragraph 14 of Count I of Plaintiffs' Complaint at Law.**

15. That at that time and place Plaintiff walked between 2 pallets placed there by SAMS employees and in doing so tripped on a clear piece of plastic that had been left to lie on the dock area, tightly stretched from one pallet to the adjacent pallet, that was unseen by Plaintiff causing him to suddenly fall and sustain a serious fracture requiring surgery.

**ANSWER: The Defendant denies the allegations and legal conclusions of paragraph 15 of Count I of Plaintiffs' Complaint at Law.**

16. This plastic wrap was lying flat to the dock floor and was not open and obvious to Plaintiff, or other invitees such as Plaintiff.

**ANSWER: The Defendant denies the allegations and legal conclusions of paragraph 16 of Count I of Plaintiffs' Complaint at Law.**

17. That there were no warning signs on, at or near to the pallets where Plaintiff had been sitting to warn Plaintiff that this plastic wrap was on the ground where he was allowed and permitted to walk.

**ANSWER: The Defendant denies the allegations and legal conclusions of paragraph 17 of Count I of Plaintiffs' Complaint at Law.**

18. That Plaintiff's attention was distracted from appreciating any tripping hazard left behind by SAMS agents and/or employees, including this plastic wrap, as Plaintiff was looking at his trailer while walking as Andy had just finished unloading the beer.

**ANSWER: The Defendant denies the allegations and legal conclusions of paragraph 18 of Count I of Plaintiffs' Complaint at Law.**

19. That Plaintiff had to encounter this plastic wrap as it was in the pathway to his trailer and crossed the dock floor from one pallet to the adjacent other.

**ANSWER: The Defendant denies the allegations and legal conclusions of paragraph 19 of Count I of Plaintiffs' Complaint at Law.**

20. That on or about April 13, 2016, Defendant SAMS by and through its agents, servants, employees, and apparent agents, including but not limited to its dock employees Judy and Andy, and others not yet identified, owed a duty of care to KEVIN KEILMAN so as to act with reasonable care to provide for his safety and provide him a safe place for him to perform his job.

**ANSWER: The Defendant avers that duties arise by operation of law rather than by allegation of the pleader and, therefore, neither admits nor denies the duty as stated in paragraph 20 of Count I of Plaintiffs' Complaint at Law.**

21. On April 13, 2016 and at all times material, SAMS individually, and thru its authorized agents, servants, and employees, breached its aforementioned duty to KEVIN KEILMAN in one or more of the following respects:

a. failed to provide Plaintiff with a safe and secure mandatory walking area while Plaintiff was in the dock area;

b. failed to provide Plaintiff with a safe and secure mandatory sitting area while Plaintiff was in the dock area;

c. failed to remove pallet deliveries from the dock floor that had arrived prior to Plaintiff's arrival;

d. had an unsafe practice of removing merchandise from some pallets in the dock area without regard to the plastic wrap debris left behind by its employees and dock workers;

e. failed to appreciate the tripping hazard of the plastic wrap debris used on the pallets and left behind by SAMS employees;

f. failed to section off the area where Plaintiff fell as a no walk zone;

g. failed to warn Plaintiff that its employees left behind some plastic wrap material that Plaintiff or others may not see and posed a danger;

h. maneuvered the already off loaded pallets that had been delivered prior to plaintiff's arrival into such a position so as to rip the plastic wrapping material, and in doing so, created a dangerous and hidden tripping hazard;

i. failed to monitor the dock area for any unsafe conditions as required by its own risk department protocols, procedures and guidelines;

j. failed to remedy this specific unsafe condition to the dock area that was created by its agents and employees while under their exclusive control;

k. was otherwise careless and/or negligent.

**ANSWER: The Defendant denies each and every allegation and legal conclusion of paragraph 21 of Count I of Plaintiffs' Complaint at Law, including subparagraphs a through k.**

22. As a direct and proximate result of the aforementioned negligent acts and/or omissions, KEVIN KEILMAN suffered bodily harm, both internally and externally; underwent surgery, suffered and will in the future suffer disfigurement, pain and suffering, disability, and loss of a normal life; has an increased risk of future harm; suffered and will in the future suffer emotional distress; has lost and will in the future lose economic benefits including monies paid for medical care, lost wages, future medical care, and future lost wages.

**ANSWER: The Defendant denies the allegations and legal conclusions of paragraph 22 of Count I of Plaintiff's Complaint at Law; the Defendant further denies that the Plaintiff was injured or damaged in the manner or to the extent alleged, or as a result of any wrongdoing of the Defendant.**

WHEREFORE, the Defendant, **Sam's West, Inc.**, denies that the Plaintiff **Kevin Keilman** is entitled to judgment in any sum and prays that the within suit be dismissed at Plaintiff's costs.

Count II — Loss of Consortium
Cynthia Keilman v. Sam's West, Inc.

1-22. Plaintiffs reincorporate paragraphs 1-24 [*sic*] and all subparts (a) thru (k) of Count I as paragraphs 1-22 of Count Two.

**ANSWER: The Defendant reasserts and restates its answers to paragraphs 1 through 22 of Count I as its answers to paragraphs 1 through 22 of Count II of Plaintiffs' Complaint at Law as though they were fully set forth herein.**

23. On April 13, 2016, Plaintiff CYNTHIA KEILMAN was and remains the lawful wife of Plaintiff KEVIN KEILMAN.

**ANSWER: The Defendant has insufficient information to admit or deny the allegations of paragraph 23 of Count II of Plaintiffs' Complaint at Law and, therefore, neither admits nor denies the allegations.**

24. As a result of the aforementioned negligent acts by Defendant SAMS, Plaintiff CYNTHIA KEILMAN has lost society, companionship, and sexual relationship with her husband, Plaintiff KEVIN KEILMAN.

**ANSWER: The Defendant denies the allegations and legal conclusions of paragraph 24 of Count II of Plaintiffs' Complaint at Law; the Defendant further denies that the Plaintiff was injured or damaged in the manner or to the extent alleged, or as a result of any wrongdoing of the Defendant.**

WHEREFORE, the Defendant, **Sam's West, Inc.**, denies that the Plaintiff **Cynthia Keilman** is entitled to judgment in any sum and prays that the within suit be dismissed at Plaintiff's costs.

## AFFIRMATIVE DEFENSES

NOW COMES the Defendant, **Sam's West, Inc.**, by and through its attorneys, James P. Balog and Brian M. Martinez of O'Hagan Meyer LLC, and for its affirmative defenses to Plaintiffs' Complaint at Law, states as follows:

1. That before and at the time of the occurrence alleged in Plaintiff's Complaint, Plaintiff **Kevin Keilman** was under a duty to exercise ordinary care for his own safety.

2. That if Plaintiff **Kevin Heilman** was injured and sustained damages as alleged in the Plaintiff's Complaint at Law, then the injuries and damages were sustained as a direct and proximate result of his breach of this duty when he committed one or more of the following negligent acts and/or omissions:

   (a) Failed to keep a proper look out; and/or

   (b) Failed to notice an open and obvious condition; and/or

   (d) Was otherwise careless and negligent at the time of the incident.

3. The forgoing acts or omissions of Plaintiff were the sole proximate cause or contributing cause of the injuries and damages sustained by Plaintiff, if any.

WHEREFORE, Defendant, **Sam's West, Inc.**, respectfully requests that if the trier of fact finds in favor of the Plaintiff **Kevin Keilman** on the issue of liability that any amount of

damages awarded to him be reduced by the percent of negligence attributable to him that caused or contributed to his alleged injuries or damages. Alternatively, should the trier of fact find that his fault exceeds fifty percent (50%), that judgment be entered in favor of the Defendant and against the Plaintiff **Kevin Keilman** with prejudice and at the cost of the Plaintiff.

Date: June 14, 2017

Respectfully submitted,

Sam's West, Inc.

By: ______________________
One of its Attorneys
James P. Balog

James P. Balog, Esq. (#6185185)
Brian M. Martinez, Esq. (#6317607)
O'HAGAN MEYER LLC
Attorneys for Defendant, Sam's West, Inc.
One East Wacker Drive, Suite 3400
Chicago, Illinois 60601
Tel: (312) 422-6100
Fax: (312) 422-6110
jbalog@ohaganmeyer.com
bmartinez@ohaganmeyer.com

## CERTIFICATE OF SERVICE

This is to certify that on the June 14, 2017, I electronically filed the foregoing **Answer and Affirmative Defenses to Plaintiffs' Complaint at Law** with the Clerk of Court using the CM/ECF system, which will send notification of, and thereby serve such document on, the following attorneys of record:

Joseph J. Leonard, Esq.
Leonard Law Group LLC
300 South Ashland Avenue
Suite 101
Chicago, Illinois 60607

by first-class U.S. mail, properly addressed and deposited, with postage prepaid, at One East Wacker Drive, Chicago, Illinois, 60601.

Dated: June 14, 2017

James P. Balog

WAL-MART STORES, INC.
Corporate Office
Bentonville, AR 72716
(501) 273-4000

Effective Date ______

# SHORT FORM VENDOR AGREEMENT

New Sequence

VENDOR NO. 651031 | DEPT 96 | SEQ 10

☒ WAL-MART ☐ UPDATE ☐ PURCHASE
☐ SAM'S CLUB ☐ EXISTING VENDOR ☐ EXPENSE & Type ______
☒ SUPERCENTER ☐ NEW VENDOR

CATEGORY Beer. wine. liquor
DEPARTMENT 96
BUYER Curt Edgell / Emi Beltran

## GENERAL VENDOR INFORMATION

Company Classification: (Please disregard this section if you are not a minority owned business)
Minority Owned? ______ Woman-Owned? ______
B____Black P____Asian-Pacific American I____Asian Indian N____Eskimo H____Hispanic N____American Indian N____Aleut N____Native Hawaiian

IF YOUR COMPANY FALLS WITHIN ANY OF THE ABOVE MINORITY CLASSES, AND HAS BEEN CERTIFIED AS MINORITY-OWNED BY A GOVERNMENT AGENCY OR PURCHASING COUNCIL, YOU ARE QUALIFIED FOR THE FIRST STEP IN THE WAL-MART MINORITY OWNED BUSINESS DEVELOPMENT PROGRAM. A COPY OF YOUR CERTIFICATION MUST BE ATTACHED TO QUALIFY.

Enter the Federal Taxpayer Identification Number (TIN) of the Payee Named Below. If a "TIN" has not been issued, enter the Employer's Social Security Number

36 -- 2534287 OR ___ -- ___ -- ___

PURCHASER RESERVES THE RIGHT TO REMIT TO THE PARTY TO WHOM THE PURCHASE ORDER IS ISSUED

ADDRESS TO MAIL PAYMENT:
Vendor Name HAYES BEER DISTRIBUTING
Factor ______
Address 12160 S. CENTRAL AVENUE
City ALSIP State IL Zip 60803

ADDRESS TO MAIL CLAIM DOCUMENTATION
Attention JAMES D. HAYES JR.
Address 12160 S. CENTRAL AVENUE
City ALSIP State IL Zip 60803
Accounting Phone Number ______
Toll Free Number ______
FAX Number 708-389-0452
Vendor Also Doing Business As (Attach a list to this Agreement if space below is insufficient)
______ Vendor # ______

TYPE OF PAYEE:
X CORPORATION
____ INDIVIDUAL (Sole Proprietor, Independent Contractor, Partnership)
____ OTHER (specify) ______

ADDRESS TO SEND PURCHASE ORDERS
Vendor Name HAYES BEER DISTRIBUTING
Attention JAMES D. HAYES JR.
Address 12160 S. CENTRAL AVENUE
City ALSIP State IL Zip 60803
Street Address for use by delivery services other than the U S mail, if not already shown in the Purchase Order address above
______ Room ______
Expedite Orders Phone ______

## NOTICE REGARDING ASSIGNMENT OF ACCOUNTS

The Vendor shall provide Purchaser written notice of an assignment, factoring, or other transfer of its right to receive payments arising under this agreement 30 days prior to such assignment, factoring, or other transfer taking legal effect. Such written notice shall include the name and address of assignee/transferee, date assignment is to begin, and terms of the assignment, and shall be considered delivered upon receipt of such written notice by the Vendor Master Clerk. Vendor shall be allowed to have only one assignment, factoring or transfer legally effective at any one point in time. No multiple assignments, factorings or transfers by the Vendor shall be permitted.

Vendor shall indemnify Purchaser against and hold Purchaser harmless from any and all lawsuits, claims, actions, damages (including reasonable attorney fees, obligations, liabilities or liens) arising or imposed in connection with the assignment or transfer of any account or right arising thereunder where the vendor has not complied with the notification assignment requirements of this section. Vendor also releases and waives any right, claim or action against Purchaser for amounts due and owing under this agreement where vendor has not complied with the notice requirements of this section. Such notice shall be mailed directly to ACCOUNTS PAYABLE CONTROL DEPARTMENT, ATTN VENDOR MASTER CLERK, BENTONVILLE, AR 72716-8009

## SHIPPING TERMS

FREIGHT TERMS
☐ COLLECT - FOB VENDOR
☒ PREPAID - FOB PURCHASER
☐ PREPAID TO CONSOLIDATOR - FOB PURCHASER'S CONSOLIDATOR

MINIMUM FOR PREPAID FREIGHT TERMS:
______ POUNDS
______ UNITS
______ DOLLARS

## DEBIT BALANCES

If Vendor has a Debit Balance with Purchaser, the amount owed Purchaser will be deducted from the next remittance or a check from Vendor to clear this amount will be paid within 30 days at the option of Purchaser

## **IMPORTANT NOTICE** ALL PAYMENTS OF MONIES MUST BE MAILED TO THE ADDRESS INDICATED BELOW:

☐ P O BOX 16045 B, ST LOUIS, MO 63160 ☐ P O BOX 500646 ST LOUIS, MO 63150-0646 (Allowance Checks) ☐ P O Box 500787, ST LOUIS, MO 63150-0787 (SAM'S)

## WARRANTY POLICY

☐ Defectives will be returned to the vendor direct from each individual location or for exchange of credit

SUB 9 60

## PAYMENT TERMS

ALL DATING SHALL BEGIN AT THE DATE OF RECEIPT OF THE GOODS AT PURCHASER'S DOCK. ON ALL E O M (END OF THE MONTH) DATINGS, GOODS RECEIVED AFTER THE 24TH OF ANY MONTH SHALL BE PAYABLE AS IF RECEIVED IN THE FOLLOWING MONTH. INVOICES SHOULD BE MAILED OR ELECTRONICALLY TRANSMITTED ON THE SAME DAY GOODS ARE SHIPPED AND SHALL DATE FROM PURCHASER'S RECEIPT OF THE GOODS

651031

A B

1 Cash Discount – Enter whole percents in Column A. For a percent with fractions, use columns A and B.
Cash Discount Days Available must be filled in if a Cash Discount is used
2 Net Payment Days Available
Yes ____ No ____ 3. E O M 4 X C O D For Alcohol Vendors

NEW STORE/CLUB/WHSE TERMS IF DIFFERENT THAN REGULAR TERMS
4.24.06

Indemnification: Vendor shall protect, defend, hold harmless and indemnify Purchaser from and against any and all claims, actions, liabilities, losses, costs and expenses, including reasonable attorney fees and costs, even if such claims are groundless, fraudulent or false, arising out of any actual or alleged infringement of any patent, trademark, tradedress or copyright by any merchandise sold to the Purchaser hereunder, or arising out of any actual or alleged death of or injury to any person, damage to any property, or any other damage or loss, by whomsoever suffered, resulting or claimed to result in whole or in part from any actual or alleged defect in such merchandise, whether latent or patent, including actual or alleged improper construction or design of said merchandise or the failure of said merchandise to comply with specifications or with any express or implied warranties of Vendor, or arising out of any actual or alleged violation by such merchandise, or its manufacturer, possession or use or sales, of any law, statute or ordinance of any governmental administrative order, rule or regulation arising out or Vendor's installation of merchandise covered by this agreement. The duties and obligations of Vendor created hereby shall not be affected or limited in any way by Purchaser's extension of express or implied warranties to its customers, except to the extent that any such warranties expressly extend beyond the scope of Vendor's warranties, express or implied, to Purchaser. It is further agreed that all duties and obligations of Vendor set forth in this paragraph shall extend in full force and effect to the pallets or other transport or display provided by or at the direction of Vendor.

ALL PURCHASES MADE BY PURCHASER SHALL BE CONTROLLED BY THE PURCHASER'S PURCHASE ORDER "TERMS AND CONDITIONS", WHICH IS ATTACHED AS A PART OF THIS AGREEMENT, AND INCLUDED WITH EACH MANUALLY TRANSMITTED ORDER

By the execution of this Vendor Merchandise Agreement, Vendor agrees to the representations stated above and on the following page. Vendor further agrees that Purchaser may rely on these representations in placing any purchase orders pursuant to information contained in this Agreement. Any changes to this Agreement must be in writing and executed by both parties.

SELLER
By [signature] (Principal of the company) (Signature needed on all 4 copies) DATE 4-10-06

PURCHASER
By [signature] (Buyer) DATE 4/18/06
By [signature] (Division Merchandise Manager)

EXHIBIT
tabbies
C

# PURCHASE ORDER TERMS AND CONDITIONS

1. Definitions: As used in these Terms and Conditions, "order" shall mean this Purchase Order and all its attachment, instructions and exhibits; "goods" shall mean any materials, machinery, equipment, article, item or work provided for in this order; "Seller" shall mean the person, firm or corporation named on the face hereof to whom this order is issued; and "Purchaser" shall mean the person, firm or corporation named on the face hereof by whom this order is issued.

2. Agreement: This order sets forth the entire agreement between Seller and Purchaser with respect to the sale and purchase of the goods, and it is not valid unless signed or initialed by an authorized buyer for Purchaser. Acceptance of this order may be made only by shipment of the goods in accordance herewith and ACCEPTANCE IS EXPRESSLY LIMITED TO ALL OF THE TERMS AND CONDITIONS OF THIS ORDER, INCLUDING ALL ATTACHMENTS AND SUPPLEMENTAL INSTRUCTIONS DELIVERED HEREWITH AND TO CURRENT SHIPPING, BILLING AND ROUTING INSTRUCTIONS OF PURCHASER. SHIPMENTS MADE CONTRARY TO PURCHASER'S ROUTING INSTRUCTIONS WILL BE CONSIDERED F.O.B. DESTINATION. (EITHER STORE OR WAREHOUSE.) Seller's invoice, confirmation memorandum or other writing may not vary the terms of this order. Seller's failure to comply with each and every term of this order shall constitute an event of default and shall be grounds for the exercise by Purchaser of any of the remedies provided for in these Terms and Conditions.

3. Warranties and Guarantees: By acceptance of this order, Seller warrants and guarantees that (a) the goods will comply with all specifications contained in this order and will be of comparable quality as all samples delivered to Purchaser, (b) the goods are not adulterated, misbranded, falsely labeled or advertised, or falsely invoiced within the meaning of any local, state or federal laws and amendments thereof now in force, (c) the goods have been labeled, advertised, and invoiced in accordance with the requirements (if applicable) of the Wool Products Labeling Act of 1939, the Fur Products Labeling Act and the Textile Fiber Products Identification Act and any and any all other governmental laws and the respective rules and regulations thereunder, (d) reasonable and representative tests made in accordance with the requirements of the Flammable Fabrics Act (if applicable) show that the goods are not so highly flammable as to be dangerous when worn by individuals, (e) the goods are properly labeled as to content as required by applicable Federal Trade Commission Trade Practice Rules, the Fair Labor Standards Act, the Federal Food, Drug and Cosmetics Act and similar laws, rules and regulations, (f) the goods ordered herein shall be delivered in good and undamaged condition and shall, when delivered, be merchantable and fit and safe for purposes for which the same are intended to be used, including without limitation, consumer use, (g) the goods do not infringe upon or violate any patent, copyright, trademark, trade name or, without limitation, any other rights belonging to others, (h) all weight, measures, sizes, legends or descriptions printed, stamped attached or otherwise indicated with regard to the goods are true and correct, and conform and comply with all laws, rules, regulations, ordinances, codes and or standards relating to said goods of federal, state and local governments, and (i) the goods are not in violation of any other laws, ordinances, statutes, rules or regulations of the United States or any state or local government or any subdivision or agency thereof. It shall be within the sole discretion of Purchaser to determine when the above mentioned warranties and guarantees have been breached. In addition to the other guarantees and warranties contained in this paragraph, the warranties of the Uniform Commercial Code are specifically incorporated herein. Nothing contained in this order shall be deemed a waiver of warranties implied by law.

4. PROHIBITION AGAINST FORCED LABOR, CHILD LABOR AND TRANS-SHIPMENTS: VENDOR CERTIFIES, REPRESENTS AND WARRANTS THAT THE GOODS PURCHASED PURSUANT TO THIS AGREEMENT ARE NOT MINED, PRODUCED, MANUFACTURED, ASSEMBLED OR PACKAGED BY THE USE OF FORCED LABOR, PRISON LABOR OR FORCED OR ILLEGAL CHILD LABOR AND THAT THE GOODS WERE NOT TRANS-SHIPPED FOR THE PURPOSE OF MISLABELING, EVADING QUOTA OR COUNTRY OF ORIGIN RESTRICTIONS OR FOR THE PURPOSE OF AVOIDING COMPLIANCE WITH FORCED LABOR, PRISON LABOR OR CHILD LABOR LAWS.

5. Remedies on Breach or Default: Failure to comply with each and every term of this order and each guarantee or warranty herein shall be grounds for the exercise by Purchaser of any one or more of the following remedies:

a) Cancellation of all or any part of this order without notice, including without limitations the balance of any order received on installment; and

b) Rejection of all or any part of any shipment by Purchaser, which may return the goods or hold them at Seller's risk and expense. Purchaser's right to reject and return or hold goods at Seller's expense and risk shall extend to goods covered by this order which are returned by Purchaser's customers for any reason entitling Purchaser to reject. Purchaser may, at its option, require Seller to grant a full refund or credit to Purchaser of the price actually paid by any customer of Purchaser for such item in lieu of replacement with respect to any item which Purchaser is entitled to reject hereunder. Purchaser shall be under no duty to inspect the goods before resale thereof and notice of rejection shall be deemed given within a reasonable time if given within a reasonable time after notice of defects or deficiencies has been given to purchaser by its customers. In respect of any goods rightfully rejected by Purchaser, there shall be charged to Seller all expenses incurred by Purchaser in (i) unpacking, examining, repacking and storing such goods ( it being agreed that in the absence of proof of a higher expense that the purchaser shall claim and allowance for each rejection at the rate of 10% of the price for each rejection made by Purchaser) and (ii) landing and reshipping such goods. When Purchaser has exercised any of the above remedies, Seller shall not have the right to make a conforming delivery within the contract time. In addition to Purchaser's remedies provided above, the buyer's remedies of the Uniform Commercial Code are specifically incorporated in this agreement.

6. Indemnification: Vendor shall protect, defend, hold harmless and indemnify Purchaser from and against any and all claims, actions, liabilities, losses, costs and expenses, including reasonable attorney fees and costs, even if such claims are groundless, fraudulent or false, arising out of any actual or alleged infringement of any patent, trademark, tradedress or copyright by any merchandise sold to the Purchaser hereunder, or arising out of any actual or alleged death of or injury to any person, damage to any property, or any other damage or loss, by whomsoever suffered, resulting or claimed to result in whole or in part from any actual or alleged defect in such merchandise, whether latent or patent, including actual or alleged improper construction or design of said merchandise or the failure of said merchandise to comply with specifications or with any express or implied warranties of Vendor, or arising out of any actual or alleged violation by such merchandise, or its manufacturer, possession or use or sales, of any law, statute or ordinance of any governmental administrative order, rule or regulation arising out or Vendor's installation of merchandise covered by this agreement. The duties and obligations of Vendor created hereby shall not be affected or limited in any way by Purchaser's extension of express or implied warranties to its customers, except to the extent that any such warranties expressly extend beyond the scope of Vendor's warranties, express or implied, to Purchaser. It is further agreed that all duties and obligations of Vendor set forth in this paragraph shall extend in full force and effect to the pallets or other transport or display provided by or at the direction of Vendor.

7. DELIVERY TIME:THE SPECIFIED HEREIN FOR SHIPMENT OF GOODS IS OF THE ESSENCE OF THIS AGREEMENT AND IF SHIPMENT IS NOT EFFECTED WITHIN THE TIME SPECIFIED, PURCHASER RESERVES THE RIGHT, AT ITS OPTION AND WITHOUT LIMITATIONS, TO CANCEL THIS ORDER OR REJECT ANY GOODS DELIVERED AFTER THE TIME SPECIFIED and to hold Seller liable for damages sustained by Purchaser as a result of Seller's failure. Notwithstanding Purchaser's right to cancel and or reject goods, Seller agrees to inform Purchaser immediately of any failure to ship any part of this order or the exact goods called for on this order on the shipment date specified. Acceptance of any goods shipped after the specified shipment date shall not be construed as a waiver of any of Purchaser's rights resulting from the late shipment.

8. Price Guarantees: Prices herein are guaranteed by Seller against manufacturer's or Seller's own price decline and against legitimate competition until date of shipment. In the event that prior to final shipment under this order Seller sells or offers to sell to others goods substantially of the same kind as ordered herein at lower prices and or on terms more favorable to a third party than those stated in this order, the prices and or terms herein shall be deemed automatically revised to equal the lowest prices and or most favorable terms at which Seller shall have sold or shall have offered such goods and payments shall be made accordingly. In the event Purchaser shall become entitled to such lower prices, but shall have made payment at any price in excess thereof, Seller shall promptly refund the difference in price to Purchaser. Seller agrees to meet the price of legitimate competition. The prices to Purchaser set forth in this order include all taxes whether or not set forth separately. If any manufacturer's excise or other similar or different taxes are paid on the goods described in this order and if such tax, or any part thereof, is refunded to Seller, than Seller shall immediately pay Purchaser the amount of such refund. In the event that a court or regulatory agency or body finds that the prices herein are in excess of that allowed by any law or regulation of any governmental agency, the prices herein shall be automatically revised to equal a price which is not in violation of said law or regulations. If Purchaser shall have made payment before it is determined that there has been a violation, Seller shall promptly refund an amount of money equal to the difference between the price paid for the goods and a price which is not in violation of said regulations.

9. DATING: ALL DATING SHALL BEGIN AT THE DATE OF RECEIPT OF THE GOODS BY PURCHASER. ON ALL E.O.M. DATINGS, GOODS RECEIVED AFTER THE 24th OF ANY MONTH SHALL BE PAYABLE AS IF RECEIVED IN THE FOLLOWING MONTH. INVOICES SHOULD BE MAILED ON THE SAME DAY GOODS ARE SHIPPED AND SHALL DATE FROM PURCHASER'S RECEIPT OF THE GOODS. CASH DISCOUNT WILL BE CALCULATED ON THE GROSS AMOUNT OF VENDOR'S INVOICE.

10. PURCHASER RESERVES THE RIGHT TO TAKE ANTICIPATION, AT PREVAILING RATE, ON ANY INVOICES PAID BEFORE DUE DATE.

11. Cancellation: Purchaser may cancel all or any part of this order at any time prior to shipment. In addition, in the event any place of business or other premises of Purchaser shall be affected by lockouts, strikes, riots, war, fire, civil insurrection, flood, earthquake, or any other casualty or cause beyond Purchaser's control, which might reasonably tend to impede or delay the reception, handling, inspecting, processing or marketing of the goods covered by this order by Purchaser, its agents or employees, Purchaser may, at its option, cancel all or any part of the undelivered order hereunder by giving written notice to Seller which notice shall be effective upon mailing.

12. Set-off: Purchaser may set off against amounts payable under this order all present and future indebtedness of the Seller to Purchaser arising from this or any other transaction whether or not related thereto.

13. Assignment: Seller shall not assign the obligation to perform this order or any part hereof, and Purchaser shall not be obligated to accept a tender of performance by any assignee, unless Purchaser shall have previously expressly consented in writing to such an assignment.

14. Publicity: Seller shall not refer to Purchaser or any company affiliated with Purchaser in publication form in connection with goods or services rendered by Seller without the prior written approval of Purchaser.

15. Validity: No finding that a part of this order is invalid or unenforceable shall affect the validity of any other part hereof.

16. Seller agrees that any credit balance will be paid in cash to Purchaser upon written request.

REV. 10/97/2

Vendor No. ______________ Department No. ______________ Effective Date

## WAL-MART STORES, INC.

## STANDARDS FOR "VENDORS"

Wal-Mart Stores, Inc. ("Wal-Mart") has enjoyed success by adhering to three basic principles since its founding in 1962. The **first principle** is the concept of providing value and service to our customers by offering quality merchandise at low prices every day. Wal-Mart has built the relationship with its customers on this basis, and we believe it is a fundamental reason for the Company's rapid growth and success. The **second principle** is corporate dedication to a partnership between the Company's associates (employees), ownership and management. This concept is extended to Wal-Mart's Vendors who have increased their business as Wal-Mart has grown. The **third principle** is a commitment by Wal-Mart to the communities in which stores and distribution centers are located.

Wal-Mart strives to conduct its business in a manner that reflects these three basic principles and the resultant fundamental values. Each of our Vendors, including our Vendors outside the United States, are expected to conform to those principles and values and to assure compliance in all contracting, subcontracting or other relationships.

Since Wal-Mart believes that the conduct of its Vendors can be transferred to Wal-Mart and affect its reputation, Wal-Mart requires that its Vendors conform to standards of business practices which are consistent with the three principles described above. More specifically, Wal-Mart requires conformity from its Vendors with the following standards, and hereby reserves the right to make periodic, unannounced inspections of Vendor's facilities to satisfy itself of Vendor's compliance with these standards:

1. **COMPLIANCE WITH APPLICABLE LAWS**
All Vendors shall comply with the legal requirements and standards of their industry under the national laws of the countries in which the Vendors are doing business, including the labor and employment laws of those countries, and any applicable U.S. laws. Should the legal requirements and standards of the industry conflict, Vendors must, at a minimum, be in compliance with the legal requirements of the country in which the products are manufactured. If, however, the industry standards exceed the country's legal requirements, Wal-Mart will favor Vendors who meet such industry standards. Vendors shall comply with all requirements of all applicable governmental agencies. Necessary invoices and required documentation must be provided in compliance with the applicable law. Vendors shall warrant to Wal-Mart that no merchandise sold to Wal-Mart infringes the patents, trademarks or copyrights of others and shall provide to Wal-Mart all necessary licenses for selling merchandise sold to Wal-Mart which is under license from a third party. All merchandise shall be accurately marked or labeled with its country of origin in compliance with applicable laws and including those of the country of manufacture. All shipments of merchandise will be accompanied by the requisite documentation issued by the proper governmental authorities, including but not limited to Form A's, import licenses, quota allocations and visas and shall comply with orderly marketing agreements, voluntary restraint agreements and other such agreements in accordance with applicable law. The commercial invoice shall, in English and in any other language deemed appropriate, accurately describe all the merchandise contained in the shipment, identify the country of origin of each article contained in the shipment, and shall list all payments, whether direct or indirect, to be made for the merchandise, including, but not limited to any assists, selling commissions or royalty payments. Backup documentation, and any Wal-Mart required changes to any documentation, will be provided by Vendors promptly. Failure to supply complete and accurate information may result in cancellation or rejection of the goods.

2. **EMPLOYMENT**
Wal-Mart is a success because its associates are considered "partners" and a strong level of teamwork has developed within the Company. Wal-Mart expects the spirit of its commitment to be reflected by its "Vendors" with respect to their employees. At a minimum, Wal-Mart expects its "Vendors" to meet the following terms and conditions of employment:

**Compensation**
"Vendors" shall fairly compensate their employees by providing wages and benefits which are in compliance with the national laws of the countries in which the "Vendors" are doing business or which are consistent with the prevailing local standards in the countries in which the "Vendors" are doing business, if the prevailing local standards are higher. Vendors shall fully comply with the wage and hour provisions of the Fair Labor Standards Act, if applicable, and shall use only subcontractors who comply with this law, if applicable.

**Hours of Labor**
"Vendors" shall maintain reasonable employee work hours in compliance with local standards and applicable national laws of the countries in which the Vendors are doing business. Employees shall not work more hours in one week than allowable under applicable law, and shall be properly compensated for overtime work. We favor "Vendors" who comply with the statutory requirements for working hours for employees and we will not use suppliers who, on a regularly scheduled basis, require employees to work in excess of the statutory requirements without proper compensation as required by applicable law. Employees should be permitted reasonable days off (which we see as at least one day off for every seven-day period) and leave privileges.

**Forced Labor/Prison Labor**
Forced or prison labor will not be tolerated by Wal-Mart. Vendors shall maintain employment on a voluntary basis. Wal-Mart will not accept products from Vendors who utilize in any manner forced labor or prison labor in the manufacture or in their contracting, subcontracting or other relationships for the manufacture of their products.

**Child Labor**
Wal-Mart will not tolerate the use of child labor in the manufacture of products it sells. Wal-Mart will not accept products from Vendors that utilize in any manner child labor in their contracting, subcontracting or other relationships for the manufacture of their products. No person shall be employed at an age younger than 15 (or 14 where the law of the country of manufacture allows) or younger than the age for completing compulsory education in the country of manufacture where such age is higher than 15.

**Discrimination/Human Rights**
Wal-Mart recognizes that cultural differences exist and different standards apply in various countries, however, we believe that all terms and conditions of employment should be based on an individual's ability to do the job, not on the basis of personal characteristics or beliefs. Wal-Mart favors Vendors who have a social and political commitment to basic principles of human rights and who do not discriminate against their employees in hiring practices or any other term or condition of work, on the basis of race, color, national origin, gender, religion, disability, or other similar factors.

3. WORKPLACE ENVIRONMENT
Wal-Mart maintains a safe, clean, healthy and productive environment for its associates and expects the same from its Vendors. Vendors shall furnish employees with safe and healthy working conditions. Factories working on Wal-Mart merchandise shall provide adequate medical facilities, fire exits and safety equipment, well lighted and comfortable workstations, clean restrooms, and adequate living quarters where necessary. Workers should be adequately trained to perform their jobs safely. Wal-Mart will not do business with any "Vendor" that provides an unhealthy or hazardous work environment or which utilizes mental or physical disciplinary practices.

4 CONCERN FOR THE ENVIRONMENT
We believe it is our role to be a leader in protecting our environment. We encourage our customers and associates to always Reduce, Reuse, and Recycle. We also encourage our Vendors to reduce excess packaging and to use recycled and non-toxic materials whenever possible. We will favor Vendors who share our commitment to the environment.

5. "BUY AMERICAN" COMMITMENT
Wal-Mart has a strong commitment to buy as much merchandise made in the United States as feasible. Vendors are encouraged to buy as many materials and components from United States sources as possible and communicate this information to Wal-Mart. Further, Vendors are encouraged to establish U.S. manufacturing operations.

6. REGULAR INSPECTION AND CERTIFICATION BY VENDOR
Vendor shall designate, on a copy of the Wal-Mart Vendor Inspection and Certification Form, one or more of its officers to inspect each of its facilities which produces merchandise sold to Wal-Mart. Such inspections shall be done on at least a quarterly basis to insure compliance with the standards, terms and conditions set forth herein. The Vendor Officer designated to perform such inspections shall certify to Wal-Mart following each inspection (i) that he or she performed such inspection and (ii) that the results reflected on such compliance inspection form are true and correct.

All charges related to the inspection and certification of such facilities shall be paid fully by the Vendor. Vendor shall maintain the completed Inspection and Certification Forms on file at each facility and shall make the forms readily accessible to Wal-Mart, its agents or employees when requested. Any Vendor which fails or refuses to comply with these standards is subject to immediate cancellation of any and all outstanding orders, refusal or return of any shipment, and termination of its business relationship with Wal-Mart.

7. RIGHT OF INSPECTION
To further assure proper implementation of and compliance with the standards set forth herein, Wal-Mart or a third party designated by Wal-Mart will undertake affirmative measures, such as on-site inspection of production facilities, to implement and monitor said standards. Any Vendor which fails or refuses to comply with these standards is subject to immediate cancellation of any and all its outstanding orders, refuse or return any shipment, and otherwise cease doing business with Wal-Mart.

8. CONFIDENTIALITY
Vendor shall not at any time, during or after the term of this Agreement, disclose to others and will not take or use for its own purposes or the purpose of others any trade secrets, confidential information, knowledge, designs, data, know-how, or any other information considered logically as "confidential." Vendor recognizes that this obligation applies not only to technical information, designs and marketing, but also to any business information that Wal-Mart treats as confidential. Any information that is not readily available to the public shall be considered to be a trade secret and confidential. Upon termination of this Agreement, for any cause, Vendor shall return all items belonging to Wal-Mart and all copies of documents containing Wal-Mart's trade secrets, confidential information, knowledge, data or know-how in Vendor's possession or under Vendor's control.

9. WAL-MART GIFT AND GRATUITY POLICY
Wal-Mart Stores, Inc. has a very strict policy which forbids and prohibits the solicitation, offering or acceptance of any gifts, gratuities or any form of "pay-off" or facilitation fee as a condition of doing business with Wal-Mart; as a form of gratitude, or as an attempt to gain favor or accept merchandise or services at a lesser degree than what was agreed. Wal-Mart believes in delivering and receiving only the total quantity agreed.

Any Vendor, factory or manufacturer who violates such policy by offering or accepting any form of gift or gratuity to any associate, employee, agent or affiliate of Wal-Mart Stores, Inc. will be subject to all loss of existing and future business, regardless of whether the gift or gratuity was accepted. In addition, a Vendor, factory or manufacturer who violates such policy, will be reported to the appropriate governmental authorities of the Vendor's respective and affiliated countries.

Failure to report such information will result in severe action against such Vendor, trading company or factory including but not limited to termination of all existing and future business relationships and monetary damages.

**A copy of these Standards for Vendors shall be posted in a location visible to all employees at all facilities that manufacture products for <u>Wal-Mart Stores, Inc.</u>**

**Any person with knowledge of a violation of any of these standards by a Vendor or a Wal-Mart associate should call 1-800-WM-ETHIC (1-800-963-8442) (in countries other than the United States, dial AT&T's U.S.A. Direct Number first) or write to: <u>Wal-Mart Stores, Inc., Business Ethics Committee, 702 SW 8th St., Bentonville, AR 72716-8095</u>**

As an officer of HAYES BEER DISTRIBUTING, a Vendor of Wal-Mart, I have read the principles and terms described in this document and understand my company's business relationship with Wal-Mart is based upon said company being in full compliance with these principles and terms. I further understand that failure by a Vendor to abide by any of the terms and conditions stated herein may result in the immediate cancellation by Wal-Mart of all outstanding orders with that Vendor and refusal by Wal-Mart to continue to do business in any manner with said Vendor. I am signing this statement, as a corporate representative of HAYES BEER DISTRIBUTING to acknowledge, accept and agree to abide by the standards, terms and conditions set forth in this Memorandum of Understanding between my company and Wal-Mart. I hereby affirm that all actions, legal and corporate, to make this Agreement binding and enforceable against HAYES BEER DISTRIBUTING have been completed.

VENDOR COMPANY NAME,
ADDRESS, TELEPHONE AND FAX NUMBER
HAYES BEER DISTRIBUTING
12160 S. CENTRAL AVENUE
ALSIP, IL 60803
PHONE (708) 389-8200
FAX (708) 389-0452

Signature: [signature]

Typed Name: JAMES D. HAYES JR.

Title: GENERAL MANAGER / V.P.

O'HAGAN MEYER

ATTORNEYS & ADVISORS

June 16, 2017

Via Certified Mail
James D. Hayes Jr.
Hayes Beer Distributing
12160 S. Central Avenue
Alsip, IL 60803

Re: *Kevin Keilmam; Cynthia Keilman v. Sam's West, Inc.*
Cook County Case No. 2017 L 002923
Our File No. 25955

Dear Mr. Hayes:

Our law firm represents Sam's West, Inc., as a Defendant in the above-referenced lawsuit pending in Cook County, Illinois. The lawsuit arises from an incident that occurred on April 13, 2016, at the Sam's West Store located at 21430 South Cicero, in the City of Matteson, when Plaintiff allegedly sustained personal injuries after tripping over clear plastic in the dock area during the unloading process when he was working as an employee of Hayes Beer Distribution. At the time this incident occurred, Plaintiff was performing services within the scope of his employment, specifically delivering and unloading the shipment of goods. A copy of the Complaint at Law is attached herein as Exhibit A.

At the time of the incident, the Vendor Services Agreement, Vendor No. 651031960 ("Agreement") between Wal-Mart Stores, Inc. and Hayes Beer Distributing ("Hayes"), dated April 10, 2006, governed the agreement between Wal-Mart and Hayes concerning Hayes distribution, delivery and unloading of goods, including Beer, Wine and Liquor at the Sam's Club store located at 21430 South Cicero, in the City of Matteson, Illinois. At the time this incident occurred, consistent with the allegations in this Complaint, Plaintiff was working as an employee of Hayes Beer Distribution within the scope of his employment at the Sam's Club store pursuant to the Agreement. A copy of the Agreement is included herein as Exhibit B.

Specifically, page 1 and page 2, Paragraph 6 of the Agreement entitled "Indemnification" provides that:

> Vendor shall protect, defend, hold harmless and indemnify Purchaser from and against any and all claims, actions, liabilities, losses, costs and expenses, including reasonable attorney fees and costs, even if such claims are groundless, fraudulent or false, arising out of any actual or alleged infringement of any patent, trademark tradedress or copyright by any merchandise sold to the Purchaser hereunder, or arising out of any actual or alleged

EXHIBIT
tabbies
D

administrative order, rule or regulation arising out or Vendor's installation of merchandise covered by this agreement. The duties and obligations of Vendor created hereby shall not be affected or limited in any way by Purchaser's extension of express or implied warranties to its customers except to the extent that any such warranties expressly extend beyond the scope of Vendor's warranties, express or implied, to purchaser. It is further agreed that all duties and obligations of Vendor set for in this paragraph shall extend in full force and effect to the pallets or other transport or display provided by or at the direction of Vendor.

See Exhibit B.

Pursuant to the terms of the Agreement, please accept this letter as Wal-Mart's formal request for defense and indemnification in the above-referenced matter and advise the undersigned within the next fourteen (14) days of your response to this tender. Also, please forward a copy of this correspondence to your insurance company.

Thank you for your attention to this matter. We look forward to hearing from you.

Very truly yours,

James P. Balog

JPB/bmm

ELECTRONICALLY FILED
3/21/2017 1:47 PM
2017-L-002923
CALENDAR: F
PAGE 1 of 6
CIRCUIT COURT OF
COOK COUNTY, ILLINOIS
LAW DIVISION
CLERK DOROTHY BROWN

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

KEVIN KEILMAN & CYNTHIA KEILMAN, )
)
Plaintiffs, ) Case No.
)
vs. )
)
SAM'S WEST, INC., by and through its authorized agents, servants, and/or employees )
)
Defendants. )

**COMPLAINT AT LAW**

NOW COMES the Plaintiffs, KEVIN and CYNTHIA KEILMAN, (hereinafter referred to as KEILMAN) by and through their attorneys, LEONARD LAW GROUP, LLC., and for their Complaint against the Defendants, SAM'S WEST, INC. (hereinafter referred to as SAMS), an Illinois Corporation, and its duly authorized agents, servants, and employees, and states as follows:

**Count I - Negligence**
**KEVIN KEILMAN v SAM'S WEST, INC.**

1. On or about April 13, 2016, and at all times material, Defendant SAMS, was a corporation duly registered in the State of Arkansas, with stores located throughout the Chicagoland area.

2. On or about April 13, 2016 and at all times material, SAMS was doing substantial business in Cook Count in the State of Illinois.

EXHIBIT
A
tabbles'

3. On or about April 13, 2016, SAMS operated, managed, conducted, and or controlled a business called SAM'S CLUB located at 21430 South Cicero, in the City of Matteson, in the County of Cook, in the State of Illinois.

4. Prior to April 13, 2016, SAMS, contracted with Plaintiff's employer Hayes Beer Distributing Company, to receive beer deliveries to SAMS located at 21430 South Cicero, in the City of Matteson, in the State of Illinois.

5. On April 13, 2016, KEVIN KEILMAN was lawfully on the premises at SAMS as an employee of Hayes Beer Distributing Company, and invitee of SAMS, in order to deliver pallets of beer to SAMS.

6. On said date and before, and at all times material, Defendant SAMS employed various individuals to work the dock area.

ELECTRONICALLY FILED
3/21/2017 1:47 PM
2017-L-002923
PAGE 2 of 6

7. On April 13, 2016, PLAINTIFF was met by an employee named Judy who was sitting behind a glass partition and handed Judy the delivery ticket.

8. On said date, Plaintiff then proceeded with permission from Judy, to enter the dock area and proceeded to walk to the dock door and lifted the SAMS dock door upward allowing access to the rear of his trailer.

9. At said place and time Plaintiff then removed two parcels in order for the designated SAMS dock worker named Andy to remove approximately 5 pallets of beer that were designated for SAMS.

10. During the unloading process, Plaintiff proceeded back to the area where Judy was working and sat down on a broken-down pallet to wait for the beer to be off loaded by SAMS employee Andy.

11. At no time was Plaintiff told he could not sit in said area while waiting.

12. That Plaintiff had sat at or near this area in the past without discipline from SAMS or any of its employees or dock workers and there were no signage or other barrier that prevented or prohibited Plaintiff from sitting there.

13. That on said date this dock area had pallets placed throughout the area where plaintiff was sitting that had been left unattended, were opened, and or/partially broken down.

14. That on said date and after Andy finished removing approximately 5 skids of beer from Plaintiff's trailer, Plaintiff arose from his seated position and began to walk back to his trailer to complete the delivery.

ELECTRONICALLY FILED
3/21/2017 1:47 PM
2017-L-002923
PAGE 3 of 6

15. That at that time and place Plaintiff walked between 2 pallets placed there by SAMS employees and in doing so tripped on a clear piece of plastic that had been left to lie on the dock area, tightly stretched from one pallet to the adjacent pallet, that was unseen by Plaintiff causing him to suddenly fall and sustain a serious fracture requiring surgery.

16. This plastic wrap was lying flat to the dock floor and was not open and obvious to Plaintiff, or other invitees such as Plaintiff.

17. That there were no warning signs on, at or near to the pallets where Plaintiff had been sitting to warn Plaintiff that this plastic wrap was on the ground where he was allowed and permitted to walk.

18. That Plaintiff's attention was distracted from appreciating any tripping hazard left behind by SAMS agents and/or employees, including this plastic wrap, as Plaintiff was looking at his trailer while walking as Andy had just finished unloading the beer.

19. That Plaintiff had to encounter this plastic wrap as it was in the pathway to his trailer and crossed the dock floor from one pallet to the adjacent other.

20. That on or about April 13, 2016, Defendant SAMS by and through its agents, servants, employees, and apparent agents, including but not limited to its dock employees Judy and Andy, and others not yet identified, owed a duty of care to KEVIN KEILMAN so as to act with reasonable care to provide for his safety and provide him a safe place for him to perform his job.

21. On April 13, 2016 and at all times material, SAMS individually, and thru its authorized agents, servants, and employees, breached its aforementioned duty to KEVIN KEILMAN in one or more of the following respects:

ELECTRONICALLY FILED
3/21/2017 1:47 PM
2017-L-002923
PAGE 4 of 6

a. failed to provide Plaintiff with a safe and secure mandatory walking area while Plaintiff was in the dock area;
b. failed to provide Plaintiff with a safe and secure mandatory sitting area while Plaintiff was in the dock area;
c. failed to remove pallet deliveries from the dock floor that had arrived prior to Plaintiff's arrival;
d. had an unsafe practice of removing merchandise from some pallets in the dock area without regard to the plastic wrap debris left behind by its employees and dock workers;
e. failed to appreciate the tripping hazard of the plastic wrap debris used on the pallets and left behind by SAMS employees;
f. failed to section off the area where Plaintiff fell as a no walk zone;
g. failed to warn Plaintiff that its employees left behind some plastic wrap material that Plaintiff or others may not see and posed a danger;
h. maneuvered the already off loaded pallets that had been delivered prior to plaintiff's arrival into such a position so as to rip the plastic wrapping material, and in doing so, created a dangerous and hidden tripping hazard;

i. failed to monitor the dock area for any unsafe conditions as required by its own risk department protocols, procedures and guidelines;

j. failed to remedy this specific unsafe condition to the dock area that was created by its agents and employees while under their exclusive control;

k. was otherwise careless and/or negligent.

22. As a direct and proximate result of the aforementioned negligent acts and/or omissions, KEVIN KEILMAN suffered bodily harm, both internally and externally; underwent surgery, suffered and will in the future suffer disfigurement, pain and suffering, disability, and loss of a normal life; has an increased risk of future harm; suffered and will in the future suffer emotional distress; has lost and will in the future lose economic benefits including monies paid for medical care, lost wages, future medical care, and future lost wages.

ELECTRONICALLY FILED
3/21/2017 1:47 PM
2017-L-002923
PAGE 5 of 6

WHEREFORE, the Plaintiff, KEVIN KEILMAN, demands judgment against the defendant, SAM'S WEST, INC.., an Illinois corporation, in an amount of money in excess of $50,000.00 plus costs.

**Count II – Loss of Consortium**
**CYNTHIA KEILMAN v SAM'S WEST, INC.**

1-22. Plaintiffs reincorporate paragraphs 1-24 and all subparts (a) thru (k) of Count I as paragraphs 1-22 of Count Two.

23. On April 13, 2016, Plaintiff CYNTHIA KEILMAN was and remains the lawful wife of Plaintiff KEVIN KEILMAN.

24. As a result of the aforementioned negligent acts by Defendant SAMS, Plaintiff CYNTHIA KEILMAN has lost society, companionship, and sexual relationship with her husband, Plaintiff KEVIN KEILMAN.

WHEREFORE, the Plaintiff, CYNTHIA KEILMAN, demands judgment against the defendant SAM'S WEST, INC.., an Illinois corporation, in an amount of money in excess of $50,000.00 plus costs.

**THE PLAINTIFF DEMANDS TRIAL BY JURY**

Respectfully,

LEONARD LAW GROUP LLC.

Joseph J. Leonard

ELECTRONICALLY FILED
3/21/2017 1:47 PM
2017-L-002923
PAGE 6 of 6

LEONARD LAW GROUP LLC.
300 South Ashland Ave., Suite 101
Chicago, IL 60607
Tel (312) 226 8273
Fax (312) 226 8274
Atty No. 49286
Joseph@Leonardlawgroup.net

ELECTRONICALLY FILED
3/21/2017 1:47 PM
2017-L-002923
CALENDAR: F
PAGE 1 of 1
CIRCUIT COURT OF
COOK COUNTY, ILLINOIS
LAW DIVISION
CLERK DOROTHY BROWN

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

| | | |
|---|---|---|
| KEVIN KEILMAN & CYNTHIA KEILMAN, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. |
| | ) | |
| vs. | ) | |
| | ) | |
| SAM'S WEST, INC., by and through its authorized agents, servants, and/or employees | ) | |
| | ) | |
| Defendants. | ) | |

**AFFIDAVIT REGARDING DAMAGES SOUGHT**

Plaintiffs, KEVIN KEILMAN & CYNTHIA KEILMAN by their attorneys Leonard Law Group, LLC., being first duty sworn under oath, state as follows;

1. That the affiant is the attorney of record for the Plaintiffs in this matter.

2. That the total money damages sought in this civil action exceeds the amount of $50,000.00.

FURTHER AFFIANT SAYETH NOT.

By: ______________________
Joseph J. Leonard

SUBSCRIBED AND SWORN to before me
this 21st day of March, 2017

______________________
Notary Public

MARIA ROSALY VILLEGAS
Official Seal
Notary Public - State of Illinois
My Commission Expires Sep 30 2020

WAL-MART STORES, INC.
Corporate Office
Bentonville, AR 72716
(501) 273-4000

Effective Date ____________

New Sequence

# SHORT FORM VENDOR AGREEMENT

VENDOR NO. 6 5 1 0 3 1 DEPT 9 6 SEQ 0

- [x] WAL-MART
- [ ] SAM'S CLUB
- [x] SUPERCENTER
- [ ] UPDATE
- [ ] EXISTING VENDOR
- [ ] NEW VENDOR
- [ ] PURCHASE
- [ ] EXPENSE & Type ______

CATEGORY Beer. wine. liquor
DEPARTMENT 96
BUYER Curt Edgell / Emi Beltran

## GENERAL VENDOR INFORMATION

Company Classification: (Please disregard this section if you are not a minority owned business)
Minority Owned? ______ Woman-Owned? ______

a____Black P____Asian-Pacific American I____Asian Indian N____Eskimo H____Hispanic N____American Indian N____Aleut N____Native Hawaiian

IF YOUR COMPANY FALLS WITHIN ANY OF THE ABOVE MINORITY CLASSES, AND HAS BEEN CERTIFIED AS MINORITY-OWNED BY A GOVERNMENT AGENCY OR PURCHASING COUNCIL, YOU ARE QUALIFIED FOR THE FIRST STEP IN THE WAL-MART MINORITY OWNED BUSINESS DEVELOPMENT PROGRAM. A COPY OF YOUR CERTIFICATION MUST BE ATTACHED TO QUALIFY.

Enter the Federal Taxpayer Identification Number (TIN) of the Payee Named Below. If a "TIN" has not been issued, enter the Employer's Social Security Number.

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 OR ______ – ______ – ______

PURCHASER RESERVES THE RIGHT TO REMIT TO THE PARTY TO WHOM THE PURCHASE ORDER IS ISSUED.

ADDRESS TO MAIL PAYMENT:
Vendor Name HAYES BEER DISTRIBUTING
Factor ______
Address 12160 S. CENTRAL AVENUE
City ALSIP State IL Zip 60803

TYPE OF PAYEE:
X CORPORATION
____ INDIVIDUAL (Sole Proprietor, Independent Contractor, Partnership)
____ OTHER (specify) ______

ADDRESS TO MAIL CLAIM DOCUMENTATION
Attention JAMES D. HAYES JR.
Address 12160 S. CENTRAL AVENUE
City ALSIP State IL Zip 60803
Accounting Phone Number ____-____-____
Toll Free Number ____-____-____
FAX Number 708-388-0452
Vendor Also Doing Business As (Attach a list to this Agreement if space below is insufficient)
______ Vendor # ______

ADDRESS TO SEND PURCHASE ORDERS
Vendor Name HAYES BEER DISTRIBUTING
Attention JAMES D. HAYES JR.
Address 12160 S. CENTRAL AVENUE
City ALSIP State IL Zip 60803
Street Address for use by delivery services other than the U.S. mail, if not already shown in the Purchase Order address above
______ Room ______
Expedite Orders: Phone ____-____-____

## NOTICE REGARDING ASSIGNMENT OF ACCOUNTS

The Vendor shall provide Purchaser written notice of an assignment, factoring, or other transfer of its right to receive payments arising under this agreement 30 days prior to such assignment, factoring, or other transfer taking legal effect. Such written notice shall include the name and address of assignee/transferee, date assignment is to begin, and terms of the assignment, and shall be considered delivered upon receipt of such written notice by the Vendor Master Clerk. Vendor shall be allowed to have only one assignment, factoring or transfer legally effective at any one point in time. No multiple assignments, factorings or transfers by the Vendor shall be permitted.

Vendor shall indemnify Purchaser against and hold Purchaser harmless from any and all lawsuits, claims, actions, damages (including reasonable attorney fees, obligations, liabilities or liens) arising or imposed in connection with the assignment or transfer of any account or right arising thereunder where the vendor has not complied with the notification assignment requirements of this section. Vendor also releases and waives any right, claim or action against Purchaser for amounts due and owing under this agreement where vendor has not complied with the notice requirements of this section. Such notice shall be mailed directly to: ACCOUNTS PAYABLE CONTROL DEPARTMENT, ATTN. VENDOR MASTER CLERK, BENTONVILLE, AR 72716-8009

## SHIPPING TERMS

FREIGHT TERMS
- [ ] COLLECT - FOB VENDOR
- [x] PREPAID - FOB PURCHASER
- [ ] PREPAID TO CONSOLIDATOR - FOB PURCHASER'S CONSOLIDATOR

MINIMUM FOR PREPAID FREIGHT TERMS:
______ POUNDS
______ UNITS
______ DOLLARS

## DEBIT BALANCES

If Vendor has a Debit Balance with Purchaser, the amount owed Purchaser will be deducted from the next remittance or a check from Vendor to clear this amount will be paid within 30 days at the option of Purchaser.

**IMPORTANT NOTICE** ALL PAYMENTS OF MONIES MUST BE MAILED TO THE ADDRESS INDICATED BELOW:

- [ ] PO BOX 10045 S. ST LOUIS, MO 63160
- [ ] PO BOX 500646 ST LOUIS, MO 63150-0646 (Allowance Checks)
- [ ] PO Box 500707, ST LOUIS, MO 63150-0707 (SAM'S)

## WARRANTY POLICY

- [ ] Defectives will be returned to the vendor direct from each individual location or for exchange of credit

DEPT/SUB 9 / 00

## PAYMENT TERMS

VENDOR # 6 5 1 0 3 1

ALL DATING SHALL BEGIN AT THE DATE OF RECEIPT OF THE GOODS AT PURCHASER'S DOCK. ON ALL E.O.M. (END OF THE MONTH) DATINGS, GOODS RECEIVED AFTER THE 24TH OF ANY MONTH SHALL BE PAYABLE AS IF RECEIVED IN THE FOLLOWING MONTH. INVOICES SHOULD BE MAILED OR ELECTRONICALLY TRANSMITTED ON THE SAME DAY GOODS ARE SHIPPED AND SHALL DATE FROM PURCHASER'S RECEIPT OF THE GOODS.

A B

1 Cash Discount – Enter whole percents in Column A. For a percent with fractions, use columns A and B.

Cash Discount Days Available must be filled in if a Cash Discount is used

2 Net Payment Days Available

3 EOM

4 [x] C.O.D. For Alcohol Vendors

Yes ____ No ____

NEW STORE/CLUB/WHSE TERMS IF DIFFERENT THAN REGULAR TERMS

4-24-06

Indemnification. Vendor shall protect, defend, hold harmless and indemnify Purchaser from and against any and all claims, actions, liabilities, losses, costs and expenses, including reasonable attorney fees and costs, even if such claims are groundless, fraudulent or false, arising out of any actual or alleged infringement of any patent, trademark, tradedress or copyright by any merchandise sold to the Purchaser hereunder, or arising out of or alleged death of or injury to any person, damage to any property, or any other damage or loss, by whomsoever suffered, resulting or claimed to result in whole or in part from any actual or alleged defect in such merchandise, whether latent or patent, including actual or alleged improper construction or design of said merchandise or the failure of said merchandise to comply with specifications or with any express or implied warranties of Vendor, or arising out of any actual or alleged violation by such merchandise, or its manufacture, possession or use or sales, of any law, statute or ordinance or any governmental administrative order, rule or regulation arising out of or Vendor's installation of merchandise covered by this agreement. The duties and obligations of Vendor created hereby shall not be affected or limited in any way by Purchaser's extension of express or implied warranties to its customers, except to the extent that any such warranties expressly extend beyond the scope of Vendor's warranties, express or implied, to Purchaser. It is further agreed that all duties and obligations of Vendor set forth in this paragraph shall extend in full force and effect to the pallets or other transport or display provided by or at the direction of Vendor.

ALL PURCHASES MADE BY PURCHASER SHALL BE CONTROLLED BY THE PURCHASER'S PURCHASE ORDER "TERMS AND CONDITIONS", WHICH IS ATTACHED AS A PART OF THIS AGREEMENT, AND INCLUDED WITH EACH MANUALLY TRANSMITTED ORDER.

By the execution of this Vendor Merchandise Agreement, Vendor agrees to the representations stated above and on the following page. Vendor further agrees that Purchaser may rely on these representations in placing any purchase orders pursuant to information contained in this Agreement. Any changes to this Agreement must be in writing and executed by both parties.

SELLER
By [signature] DATE 4-10-06
(Principal of the company) (Signature needed on all 4 copies)

PURCHASER
By [signature] DATE 4/18/06
(Buyer)
By [signature] DATE 4/19/06
(Division Merchandise Manager)



EXHIBIT B

# PURCHASE ORDER TERMS AND CONDITIONS

1. Definitions: As used in these Terms and Conditions, "order" shall mean this Purchase Order and all its attachment, instructions and exhibits; "goods" shall mean any materials, machinery, equipment, article, item or work provided for in this order; "Seller" shall mean the person, firm or corporation named on the face hereof to whom this order is issued; and "Purchaser" shall mean the person, firm or corporation named on the face hereof by whom this order is issued.

2. Agreement: This order sets forth the entire agreement between Seller and Purchaser with respect to the sale and purchase of the goods, and it is not valid unless signed or initialed by an authorized buyer for Purchaser. Acceptance of this order may be made only by shipment of the goods in accordance herewith and ACCEPTANCE IS EXPRESSLY LIMITED TO ALL OF THE TERMS AND CONDITIONS OF THIS ORDER, INCLUDING ALL ATTACHMENTS AND SUPPLEMENTAL INSTRUCTIONS DELIVERED HEREWITH AND TO CURRENT SHIPPING, BILLING AND ROUTING INSTRUCTIONS OF PURCHASER. SHIPMENTS MADE CONTRARY TO PURCHASER'S ROUTING INSTRUCTIONS WILL BE CONSIDERED F.O.B. DESTINATION. (EITHER STORE OR WAREHOUSE.) Seller's invoice, confirmation memorandum or other writing may not vary the terms of this order. Seller's failure to comply with each and every term of this order shall constitute an event of default and shall be grounds for the exercise by Purchaser of any of the remedies provided for in these Terms and Conditions.

3. Warranties and Guarantees: By acceptance of this order, Seller warrants and guarantees that (a) the goods will comply with all specifications contained in this order and will be of comparable quality as all samples delivered to Purchaser, (b) the goods are not adulterated, misbranded, falsely labeled or advertised, or falsely invoiced within the meaning of any local, state or federal laws and amendments thereof now in force, (c) the goods have been labeled, advertised, and invoiced in accordance with the requirements (if applicable) of the Wool Products Labeling Act of 1939, the Fur Products Labeling Act and the Textile Fiber Products Identification Act and any and all other governmental laws and the respective rules and regulations thereunder, (d) reasonable and representative tests made in accordance with the requirements of the Flammable Fabrics Act (if applicable) show that the goods are not so highly flammable as to be dangerous when worn by individuals, (e) the goods are properly labeled as to content as required by applicable Federal Trade Commission Trade Practice Rules, the Fair Labor Standards Act, the Federal Food, Drug and Cosmetics Act and similar laws, rules and regulations, (f) the goods ordered herein shall be delivered in good and undamaged condition and shall, when delivered, be merchantable and fit and safe for purposes for which the same are intended to be used, including without limitation, consumer use, (g) the goods do not infringe upon or violate any patent, copyright, trademark, trade name or, without limitation, any other rights belonging to others, (h) all weight, measures, sizes, legends or descriptions printed, stamped attached or otherwise indicated with regard to the goods are true and correct, and conform and comply with all laws, rules, regulations, ordinances, codes and or standards relating to said goods of federal, state and local governments, and (i) the goods are not in violation of any other laws, ordinances, statutes, rules or regulations of the United States or any state or local government or any subdivision or agency thereof. It shall be within the sole discretion of Purchaser to determine when the above mentioned warranties and guarantees have been breached. In addition to the other guarantees and warranties contained in this paragraph, the warranties of the Uniform Commercial Code are specifically incorporated herein. Nothing contained in this order shall be deemed a waiver of warranties implied by law.

4. PROHIBITION AGAINST FORCED LABOR, CHILD LABOR AND TRANS-SHIPMENTS: VENDOR CERTIFIES, REPRESENTS AND WARRANTS THAT THE GOODS PURCHASED PURSUANT TO THIS AGREEMENT ARE NOT MINED, PRODUCED, MANUFACTURED, ASSEMBLED OR PACKAGED BY THE USE OF FORCED LABOR, PRISON LABOR OR FORCED OR ILLEGAL CHILD LABOR AND THAT THE GOODS WERE NOT TRANS-SHIPPED FOR THE PURPOSE OF MISLABELING, EVADING QUOTA OR COUNTRY OF ORIGIN RESTRICTIONS OR FOR THE PURPOSE OF AVOIDING COMPLIANCE WITH FORCED LABOR, PRISON LABOR OR CHILD LABOR LAWS.

5. Remedies on Breach or Default: Failure to comply with each and every term of this order and each guarantee or warranty herein shall be grounds for the exercise by Purchaser of any one or more of the following remedies:

a) Cancellation of all or any part of this order without notice, including without limitations the balance of any order received on installment; and

b) Rejection of all or any part of any shipment by Purchaser, which may return the goods or hold them at Seller's risk and expense. Purchaser's right to reject and return or hold goods at Seller's expense and risk shall extend to goods covered by this order which are returned by Purchaser's customers for any reason entitling Purchaser to reject. Purchaser may, at its option, require Seller to grant a full refund or credit to Purchaser of the price actually paid by any customer of Purchaser for such item in lieu of replacement with respect to any item which Purchaser is entitled to reject hereunder. Purchaser shall be under no duty to inspect the goods before resale thereof and notice of rejection shall be deemed given within a reasonable time if given within a reasonable time after notice of defects or deficiencies has been given to purchaser by its customers. In respect of any goods rightfully rejected by Purchaser, there shall be charged to Seller all expenses incurred by Purchaser in (i) unpacking, examining, repacking and storing such goods ( it being agreed that in the absence of proof of a higher expense that the purchaser shall claim and allowance for each rejection at the rate of 10% of the price for each rejection made by Purchaser) and (ii) landing and reshipping such goods. When Purchaser has exercised any of the above remedies, Seller shall not have the right to make a conforming delivery within the contract time. In addition to Purchaser's remedies provided above, the buyer's remedies of the Uniform Commercial Code are specifically incorporated in this agreement.

6. Indemnification: Vendor shall protect, defend, hold harmless and indemnify Purchaser from and against any and all claims, actions, liabilities, losses, costs and expenses, including reasonable attorney fees and costs, even if such claims are groundless, fraudulent or false, arising out of any actual or alleged infringement of any patent, trademark, tradedress or copyright by any merchandise sold to the Purchaser hereunder, or arising out of any actual or alleged death of or injury to any person, damage to any property, or any other damage or loss, by whomsoever suffered, resulting or claimed to result in whole or in part from any actual or alleged defect in such merchandise, whether latent or patent, including actual or alleged improper construction or design of said merchandise or the failure of said merchandise to comply with specifications or with any express or implied warranties of Vendor, or arising out of any actual or alleged violation by such merchandise, or its manufacturer, possession or use or sales, of any law, statute or ordinance of any governmental administrative order, rule or regulation arising out or Vendor's installation of merchandise covered by this agreement. The duties and obligations of Vendor created hereby shall not be affected or limited in any way by Purchaser's extension of express or implied warranties to its customers, except to the extent that any such warranties expressly extend beyond the scope of Vendor's warranties, express or implied, to Purchaser. It is further agreed that all duties and obligations of Vendor set forth in this paragraph shall extend in full force and effect to the pallets or other transport or display provided by or at the direction of Vendor.

7. DELIVERY TIME:THE SPECIFIED HEREIN FOR SHIPMENT OF GOODS IS OF THE ESSENCE OF THIS AGREEMENT AND IF SHIPMENT IS NOT EFFECTED WITHIN THE TIME SPECIFIED, PURCHASER RESERVES THE RIGHT, AT ITS OPTION AND WITHOUT LIMITATIONS, TO CANCEL THIS ORDER OR REJECT ANY GOODS DELIVERED AFTER THE TIME SPECIFIED and to hold Seller liable for damages sustained by Purchaser as a result of Seller's failure. Notwithstanding Purchaser's right to cancel and or reject goods, Seller agrees to inform Purchaser immediately of any failure to ship any part of this order or the exact goods called for on this order on the shipment date specified. Acceptance of any goods shipped after the specified shipment date shall not be construed as a waiver of any of Purchaser's rights resulting from the late shipment.

8. Price Guarantees: Prices herein are guaranteed by Seller against manufacturer's or Seller's own price decline and against legitimate competition until date of shipment. In the event that prior to final shipment under this order Seller sells or offers to sell to others goods substantially of the same kind as ordered herein at lower prices and or on terms more favorable to a third party than those stated in this order, the prices and or terms herein shall be deemed automatically revised to equal the lowest prices and or most favorable terms at which Seller shall have sold or shall have offered such goods and payments shall be made accordingly. In the event Purchaser shall become entitled to such lower prices, but shall have made payment at any price in excess thereof, Seller shall promptly refund the difference in price to Purchaser. Seller agrees to meet the price of legitimate competition. The prices to Purchaser set forth in this order include all taxes whether or not set forth separately. If any manufacturer's excise or other similar or different taxes are paid on the goods described in this order and if such tax, or any part thereof, is refunded to Seller, than Seller shall immediately pay Purchaser the amount of such refund. In the event that a court or regulatory agency or body finds that the prices herein are in excess of that allowed by any law or regulation of any governmental agency, the prices herein shall be automatically revised to equal a price which is not in violation of said law or regulations. If Purchaser shall have made payment before it is determined that there has been a violation, Seller shall promptly refund an amount of money equal to the difference between the price paid for the goods and a price which is not in violation of said regulations.

9. DATING: ALL DATING SHALL BEGIN AT THE DATE OF RECEIPT OF THE GOODS BY PURCHASER. ON ALL E.O.M. DATINGS, GOODS RECEIVED AFTER THE 24th OF ANY MONTH SHALL BE PAYABLE AS IF RECEIVED IN THE FOLLOWING MONTH. INVOICES SHOULD BE MAILED ON THE SAME DAY GOODS ARE SHIPPED AND SHALL DATE FROM PURCHASER'S RECEIPT OF THE GOODS. CASH DISCOUNT WILL BE CALCULATED ON THE GROSS AMOUNT OF VENDOR'S INVOICE.

10. PURCHASER RESERVES THE RIGHT TO TAKE ANTICIPATION, AT PREVAILING RATE, ON ANY INVOICES PAID BEFORE DUE DATE.

11. Cancellation: Purchaser may cancel all or any part of this order at any time prior to shipment. In addition, in the event any place of business or other premises of Purchaser shall be affected by lockouts, strikes, riots, war, fire, civil insurrection, flood, earthquake, or any other casualty or cause beyond Purchaser's control, which might reasonably tend to impede or delay the reception, handling, inspecting, processing or marketing of the goods covered by this order by Purchaser, its agents or employees, Purchaser may, at its option, cancel all or any part of the undelivered order hereunder by giving written notice to Seller which notice shall be effective upon mailing.

12. Set-off: Purchaser may set off against amounts payable under this order all present and future indebtedness of the Seller to Purchaser arising from this or any other transaction whether or not related thereto.

13. Assignment: Seller shall not assign the obligation to perform this order or any part hereof, and Purchaser shall not be obligated to accept a tender of performance by any assignee, unless Purchaser shall have previously expressly consented in writing to such an assignment.

14. Publicity: Seller shall not refer to Purchaser or any company affiliated with Purchaser in publication form in connection with goods or services rendered by Seller without the prior written approval of Purchaser.

15. Validity: No finding that a part of this order is invalid or unenforceable shall affect the validity of any other part hereof.

16. Seller agrees that any credit balance will be paid in cash to Purchaser upon written request.

Vendor No. ______________________ Department No. ______________ Effective Date

WAL-MART STORES, INC.

STANDARDS FOR "VENDORS"

Wal-Mart Stores, Inc. ("Wal-Mart") has enjoyed success by adhering to three basic principles since its founding in 1962. The **first principle** is the concept of providing value and service to our customers by offering quality merchandise at low prices every day. Wal-Mart has built the relationship with its customers on this basis, and we believe it is a fundamental reason for the Company's rapid growth and success. The **second principle** is corporate dedication to a partnership between the Company's associates (employees), ownership and management. This concept is extended to Wal-Mart's Vendors who have increased their business as Wal-Mart has grown. The **third principle** is a commitment by Wal-Mart to the communities in which stores and distribution centers are located.

Wal-Mart strives to conduct its business in a manner that reflects these three basic principles and the resultant fundamental values. Each of our Vendors, including our Vendors outside the United States, are expected to conform to those principles and values and to assure compliance in all contracting, subcontracting or other relationships.

Since Wal-Mart believes that the conduct of its Vendors can be transferred to Wal-Mart and affect its reputation, Wal-Mart requires that its Vendors conform to standards of business practices which are consistent with the three principles described above. More specifically, Wal-Mart requires conformity from its Vendors with the following standards, and hereby reserves the right to make periodic, unannounced inspections of Vendor's facilities to satisfy itself of Vendor's compliance with these standards:

1. COMPLIANCE WITH APPLICABLE LAWS
All Vendors shall comply with the legal requirements and standards of their industry under the national laws of the countries in which the Vendors are doing business, including the labor and employment laws of those countries, and any applicable U.S. laws. Should the legal requirements and standards of the industry conflict, Vendors must, at a minimum, be in compliance with the legal requirements of the country in which the products are manufactured. If, however, the industry standards exceed the country's legal requirements, Wal-Mart will favor Vendors who meet such industry standards. Vendors shall comply with all requirements of all applicable governmental agencies. Necessary invoices and required documentation must be provided in compliance with the applicable law. Vendors shall warrant to Wal-Mart that no merchandise sold to Wal-Mart infringes the patents, trademarks or copyrights of others and shall provide to Wal-Mart all necessary licenses for selling merchandise sold to Wal-Mart which is under license from a third party. All merchandise shall be accurately marked or labeled with its country of origin in compliance with applicable laws and including those of the country of manufacture. All shipments of merchandise will be accompanied by the requisite documentation issued by the proper governmental authorities, including but not limited to Form A's, import licenses, quota allocations and visas and shall comply with orderly marketing agreements, voluntary restraint agreements and other such agreements in accordance with applicable law. The commercial invoice shall, in English and in any other language deemed appropriate, accurately describe all the merchandise contained in the shipment, identify the country of origin of each article contained in the shipment, and shall list all payments, whether direct or indirect, to be made for the merchandise, including, but not limited to any assists, selling commissions or royalty payments. Backup documentation, and any Wal-Mart required changes to any documentation, will be provided by Vendors promptly. Failure to supply complete and accurate information may result in cancellation or rejection of the goods.

2. EMPLOYMENT
Wal-Mart is a success because its associates are considered "partners" and a strong level of teamwork has developed within the Company. Wal-Mart expects the spirit of its commitment to be reflected by its "Vendors" with respect to their employees. At a minimum, Wal-Mart expects its "Vendors" to meet the following terms and conditions of employment:

Compensation
"Vendors" shall fairly compensate their employees by providing wages and benefits which are in compliance with the national laws of the countries in which the "Vendors" are doing business or which are consistent with the prevailing local standards in the countries in which the "Vendors" are doing business, if the prevailing local standards are higher. Vendors shall fully comply with the wage and hour provisions of the Fair Labor Standards Act, if applicable, and shall use only subcontractors who comply with this law, if applicable.

Hours of Labor
"Vendors" shall maintain reasonable employee work hours in compliance with local standards and applicable national laws of the countries in which the Vendors are doing business. Employees shall not work more hours in one week than allowable under applicable law, and shall be properly compensated for overtime work. We favor "Vendors" who comply with the statutory requirements for working hours for employees and we will not use suppliers who, on a regularly scheduled basis, require employees to work in excess of the statutory requirements without proper compensation as required by applicable law. Employees should be permitted reasonable days off (which we see as at least one day off for every seven-day period) and leave privileges.

Forced Labor/Prison Labor
Forced or prison labor will not be tolerated by Wal-Mart. Vendors shall maintain employment on a voluntary basis. Wal-Mart will not accept products from Vendors who utilize in any manner forced labor or prison labor in the manufacture or in their contracting, subcontracting or other relationships for the manufacture of their products.

Child Labor
Wal-Mart will not tolerate the use of child labor in the manufacture of products it sells. Wal-Mart will not accept products from Vendors that utilize in any manner child labor in their contracting, subcontracting or other relationships for the manufacture of their products. No person shall be employed at an age younger than 15 (or 14 where the law of the country of manufacture allows) or younger than the age for completing compulsory education in the country of manufacture where such age is higher than 15.

Discrimination/Human Rights
Wal-Mart recognizes that cultural differences exist and different standards apply in various countries, however, we believe that all terms and conditions of employment should be based on an individual's ability to do the job, not on the basis of personal characteristics or beliefs. Wal-Mart favors Vendors who have a social and political commitment to basic principles of human rights and who do not discriminate against their employees in hiring practices or any other term or condition of work, on the basis of race, color, national origin, gender, religion, disability, or other similar factors.

3. WORKPLACE ENVIRONMENT
Wal-Mart maintains a safe, clean, healthy and productive environment for its associates and expects the same from its Vendors. Vendors shall furnish employees with safe and healthy working conditions. Factories working on Wal-Mart merchandise shall provide adequate medical facilities, fire exits and safety equipment, well lighted and comfortable workstations, clean restrooms, and adequate living quarters where necessary. Workers should be adequately trained to perform their jobs safely. Wal-Mart will not do business with any "Vendor" that provides an unhealthy or hazardous work environment or which utilizes mental or physical disciplinary practices.

4. CONCERN FOR THE ENVIRONMENT
We believe it is our role to be a leader in protecting our environment. We encourage our customers and associates to always Reduce, Reuse, and Recycle. We also encourage our Vendors to reduce excess packaging and to use recycled and non-toxic materials whenever possible. We will favor Vendors who share our commitment to the environment.

5. "BUY AMERICAN" COMMITMENT
Wal-Mart has a strong commitment to buy as much merchandise made in the United States as feasible. Vendors are encouraged to buy as many materials and components from United States sources as possible and communicate this information to Wal-Mart. Further, Vendors are encouraged to establish U.S. manufacturing operations.

6. REGULAR INSPECTION AND CERTIFICATION BY VENDOR
Vendor shall designate, on a copy of the Wal-Mart Vendor Inspection and Certification Form, one or more of its officers to inspect each of its facilities which produces merchandise sold to Wal-Mart. Such inspections shall be done on at least a quarterly basis to insure compliance with the standards, terms and conditions set forth herein. The Vendor Officer designated to perform such inspections shall certify to Wal-Mart following each inspection (i) that he or she performed such inspection and (ii) that the results reflected on such compliance inspection form are true and correct.

All charges related to the inspection and certification of such facilities shall be paid fully by the Vendor. Vendor shall maintain the completed Inspection and Certification Forms on file at each facility and shall make the forms readily accessible to Wal-Mart, its agents or employees when requested. Any Vendor which fails or refuses to comply with these standards is subject to immediate cancellation of any and all outstanding orders, refusal or return of any shipment, and termination of its business relationship with Wal-Mart.

7. RIGHT OF INSPECTION
To further assure proper implementation of and compliance with the standards set forth herein, Wal-Mart or a third party designated by Wal-Mart will undertake affirmative measures, such as on-site inspection of production facilities, to implement and monitor said standards. Any Vendor which fails or refuses to comply with these standards is subject to immediate cancellation of any and all its outstanding orders, refuse or return any shipment, and otherwise cease doing business with Wal-Mart.

8. CONFIDENTIALITY
Vendor shall not at any time, during or after the term of this Agreement, disclose to others and will not take or use for its own purposes or the purpose of others any trade secrets, confidential information, knowledge, designs, data, know-how, or any other information considered logically as "confidential." Vendor recognizes that this obligation applies not only to technical information, designs and marketing, but also to any business information that Wal-Mart treats as confidential. Any information that is not readily available to the public shall be considered to be a trade secret and confidential. Upon termination of this Agreement, for any cause, Vendor shall return all items belonging to Wal-Mart and all copies of documents containing Wal-Mart's trade secrets, confidential information, knowledge, data or know-how in Vendor's possession or under Vendor's control.

9. WAL-MART GIFT AND GRATUITY POLICY
Wal-Mart Stores, Inc. has a very strict policy which forbids and prohibits the solicitation, offering or acceptance of any gifts, gratuities or any form of "pay-off" or facilitation fee as a condition of doing business with Wal-Mart; as a form of gratitude, or as an attempt to gain favor or accept merchandise or services at a lesser degree than what was agreed. Wal-Mart believes in delivering and receiving only the total quantity agreed.

Any Vendor, factory or manufacturer who violates such policy by offering or accepting any form of gift or gratuity to any associate, employee, agent or affiliate of Wal-Mart Stores, Inc. will be subject to all loss of existing and future business, regardless of whether the gift or gratuity was accepted. In addition, a Vendor, factory or manufacturer who violates such policy, will be reported to the appropriate governmental authorities of the Vendor's respective and affiliated countries.

Failure to report such information will result in severe action against such Vendor, trading company or factory including but not limited to termination of all existing and future business relationships and monetary damages.

**A copy of these Standards for Vendors shall be posted in a location visible to all employees at all facilities that manufacture products for Wal-Mart Stores, Inc.**

**Any person with knowledge of a violation of any of these standards by a Vendor or a Wal-Mart associate should call 1-800-WM-ETHIC (1-800-963-8442) (in countries other than the United States, dial AT&T's U.S.A. Direct Number first) or write to: Wal-Mart Stores, Inc., Business Ethics Committee, 702 SW 8th St., Bentonville, AR 72716-8095**

As an officer of HAYES BEER DISTRIBUTING, a Vendor of Wal-Mart, I have read the principles and terms described in this document and understand my company's business relationship with Wal-Mart is based upon said company being in full compliance with these principles and terms. I further understand that failure by a Vendor to abide by any of the terms and conditions stated herein may result in the immediate cancellation by Wal-Mart of all outstanding orders with that Vendor and refusal by Wal-Mart to continue to do business in any manner with said Vendor. I am signing this statement, as a corporate representative of HAYES BEER DISTRIBUTING to acknowledge, accept and agree to abide by the standards, terms and conditions set forth in this Memorandum of Understanding between my company and Wal-Mart. I hereby affirm that all actions, legal and corporate, to make this Agreement binding and enforceable against HAYES BEER DISTRIBUTING have been completed.

VENDOR COMPANY NAME,
ADDRESS, TELEPHONE AND FAX NUMBER
HAYES BEER DISTRIBUTING
12160 S. CENTRAL AVENUE
ALSIP, IL 60803
PHONE (708) 389-8200
FAX (708) 389-0457

Signature: [signature]
Typed Name: JAMES D. HAYES JR.
Title GENERAL MANAGER / V.P.